**PHOENIX CANADA OIL COMPANY LIMITED, Plaintiff,**

v.

**TEXACO INC., Gulf Oil Corporation, Texaco Petroleum Company and Ecuadorian Gulf Oil Company, Defendants.**

Civ. A. No. 76–421.

United States District Court,
D. Delaware.

April 8, 1983.

Joseph A. Rosenthal, Morris & Rosenthal, P.A., Wilmington, Del., for plaintiff; Edward Nathan, and Randi Jones, New York City, of counsel.

William O. LaMotte, and Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants; Milton J. Sherman, Edward A. Friedman, Milton J. Schubin, and David F. Ryan, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Pending before the Court is defendants' motion for summary judgment which was

referred to Magistrate N. Richard Powers. The Magistrate issued Reports and Recommendations on December 11, 1981 (the "December 11 Report") and May 7, 1982 (the "May 7 Report"). Objections and replies have been filed by each party.

I. Background

This case involves a controversy over royalty rights relating to oil exploration and production in Ecuador. The facts underlying the dispute have been related in a prior opinion, *Phoenix Canada Co., Ltd. v. Texaco, Inc.,* 78 F.R.D. 445 (D.Del.1978), and in the Magistrate's December 11 Report. Nonetheless, the disposition of this summary judgment motion warrants a recitation of the facts.

Plaintiff, Phoenix Canada Oil Co., Ltd. ("Phoenix") is a Canadian corporation with offices in Toronto, Canada and New York. Defendants are two major oil and gas companies and the wholly-owned subsidiaries through which they transact business in Ecuador.[1] All defendants but Gulf, a Pennsylvania corporation,[2] are incorporated in Delaware and, as such, jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. The Court has considered and denied defendants' motion to dismiss on the basis of *forum non conveniens* and the doctrines of act of state and foreign governmental compulsion, *Phoenix Canada,* 78 F.R.D. 445, and plaintiff's motion for partial summary judgment. Docket entry ("Dkt.") 123, p. 74 (denied without prejudice from the bench). The current motion, if granted, would dispose of most, but not all, of the allegations in the complaint.[3]

In 1961, Minas y Petroleos del Ecuador S.A. ("Minas"), a wholly owned subsidiary of Norsul Oil and Mining, Ltd. ("Norsul"), obtained a concession from the government of Ecuador for, the exploration, development, and marketing of petroleum and natural gas deposits in Ecuador's Oriente Province. Minas was to pay royalties for each barrel of oil produced and to construct facilities in order to develop the area covered by the concession. In 1963, Norsul and Phoenix entered an agreement under which the latter gained a fifty percent interest in Minas in exchange for technical and financial assistance.[4]

On July 16, 1965, Minas entered into an agreement assigning certain rights to the predecessors of the defendant subsidiaries ("1965 Contract"). Dkt. 137A, Ex. 2. The assignment allowed the subsidiaries to develop an area encompassing approximately fifteen percent of the concession area (the "Transfer Zone") in exchange for $100,000 and a royalty amounting to "the value of . . . two percent (2%) of the net production . . . of all crude oil produced in the transfer zone . . . and sold or delivered by the cessionaries." 1965 Contract, at A–49.

After approval by the government of Ecuador, the transfer was accomplished in a conveyance of rights to exploit the Transfer Zone by public deed executed February 26, 1966. Dkt. 137A, Ex. 4 ("1966 Deed").[5] In 1969, defendants publicly announced the discovery of substantial oil reserves in the concession area. Commercial production began in August of 1972 and Minas began receiving a two percent royalty from defendants.[6] Plaintiff alleges that between

---

1. The defendants are: Texaco Inc. ("Texaco"); Gulf Oil Corporation ("Gulf"); Texaco Petroleum Company ("Texaco Ecuador"); and Ecuadorian Gulf Oil Company ("Gulf Ecuador").

2. Gulf is registered to do business in Delaware and maintains a registered agent within the state.

3. *See* Complaint, Dkt. 1, ¶ 58(b). Plaintiff alleges that defendants refused to pay the full amount of gross royalty due through unauthorized deduction for export taxes, pipeline tariffs, port taxes and oil utilized for internal consumption and for improper calculation of base figures for gross production volume.

4. The 1961 concession allowed Minas to transfer its rights if prior governmental authorization was obtained. It also allowed Minas to return the land, or any portion of the land, to the government at any time. Dkt. 137A, Ex. 1, A–8, A–21—A–22.

5. The 1966 Deed was attached, in an unexecuted form, to the 1965 Contract.

6. Phoenix claims a one-half interest in the two percent royalty as a successor in interest of Minas. Norsul claims the remaining one-half interest.

1971 and 1973 defendants failed to make timely royalty payments.

Pursuant to a governmental decree, in May of 1973, the Ecuadorian government levied a retroactive 86 percent withholding tax on income resulting from transfers of hydrocarbon concessions. Supreme Decree No. 602, May 29, 1973, Dkt. 137A, Ex. 18. This substantially reduced the income Phoenix derived from its royalty interest. Thus, the government of Ecuador was receiving not only substantial royalties from the defendants for each barrel of oil produced from the Transfer Zone, it also heavily taxed the income to Phoenix from the same oil.

On August 4, 1973, the government of Ecuador issued Executive Decree No. 925 which empowered the Minister of Natural Gas and Energy to renegotiate the terms of the original 1961 concession. Dkt. 137A, Ex. 19. The decree increased the amount of royalty payable by the defendants on each barrel of oil and authorized the Ecuadorian government oil company ("CEPE") to acquire up to 25 percent of the defendants' interest in the Transfer Zone. This option was exercised in June of 1974,[7] and

since that time, defendants have refused to pay Phoenix 25 percent of the gross royalties from subsequent production. Defendants have also refused to remit to Phoenix any share of the proceeds of the sale of defendants' interest to CEPE.[8]

In 1976 Gulf initiated negotiations with the Ecuadorian government to surrender its remaining interest in the Transfer Zone. Supreme Decree No. 1064 terminated the government's prior contract with regard to Gulf's interest. Dkt. 137C, Ex. 30. On May 26, 1977 Gulf and the government executed an agreement transferring Gulf's rights in the 1973 contract. Dkt. 137C, Ex. 31.[9]

Upon the partial Ecuadorian assumption of defendants' interests in the Transfer Zone, a dispute arose concerning the payment of royalties by defendants to Phoenix for that portion of oil attributable to the government's interest. Dkt. 137B, Ex. 21.[10] This dispute was brought before the Ministry and specifically addressed the question of whether a 25 percent reduction, reflecting CEPE's interest, in the crude produced from the Transfer Zone was proper for purposes of calculating the two percent royalty payable to plaintiff and Norsul.[11] On

---

**7.** Decree No. 925 provided for exercise of the option in mid-1977 but on January 2, 1974, the Ecuadorian government promulgated Supreme Decree No. 09 allowing the Ministry to immediately increase the government's participation in hydrocarbon concessions. Dkt. 137B, Ex. 20. A contract was executed effective June 6, 1974, granting CEPE a 25 percent interest in the gross oil production from the Transfer Zone, certain oil storage facilities, and the Trans-Ecuadorian pipeline.

**8.** The consideration paid by CEPE for the 25 percent interest was based on four components: first, preproduction investments; second, investments until June 6, 1974, subject to amortization or depreciation; third, the cost of warehoused equipment and materials; and fourth, the depreciated value of components one and two as of June 6, 1974. Dkt. 137B, Ex. 20, at A–220. A Peat, Marwick, Mitchell & Co. audit report determined the net capital investment in assets was $180,901,000. Dkt. 137D, Ex. 44, at A–563–64. CEPE was to pay 25 percent of this value, or $45,230,000.

**9.** The compensation paid by CEPE to Gulf was calculated similarly to the 1974 transfer. Gulf's share in the net producing assets was valued at $73,931,625. Lucas Aff., ¶ 17 n. 7;

Dkt. 136. Gulf was also compensated for its remaining interest in the Trans-Ecuadorian pipeline, and for materials and supplies.

**10.** Plaintiff contends that this dispute was brought not by plaintiff, but by defendants and the Banco de Fomento. This contention, however, has little bearing because Banco de Fomento, as collector of the 86 percent tax, was contesting defendants' underpayment of royalties based on the part of production acquired by CEPE—the same basic contention of Phoenix. Therefore, the parties to the dispute matter little in this context. Furthermore, Phoenix responded to this dispute, contesting defendants' position and stating "as we represent 50% of the remaining 19%, we have the right to ask the Ministry, as Special Judge in all matters pertaining to hydrocarbon contracts, to give its binding interpretation of this problem," and "that a decision on the suspension of payment is expedited as it has harmed us as well as the Banco National deFomento greatly." Dkt. 137B, Ex. 22, at A–199, A–214.

**11.** Phoenix specifically argued that the 1965 Contract was inviolate and no reduction was proper. Dkt. 137B, Ex. 22.

June 3, 1974, the Ministry issued Ministerial Resolution No. 11927 ("Res. 11927") which, *inter alia,* found that "there shall be excluded, in order to carry out the assessment of the 2% the percentage of CEPE in the net production." Dkt. 137B, Ex. 23, Art. 6, at A–217.

Defendants sought review of Res. 11927 and a "Sentencia" of the Ministry affirmed the conclusion rendered. Dkt. 137B, Ex. 27. The effect of Res. 11927 and the Sentencia was to reduce Phoenix's royalty base by 25 percent. Similarly, when CEPE acquired Gulf's interest in the Transfer Zone, amounting to 37.5 percent of the Transfer Zone, Phoenix's royalty base was reduced again. This proportional reduction amounted to 62.5 percent of the original base.

The foregoing synopsis of the facts underlying this dispute should not be considered complete. It simply represents an attempt to place the major landmarks on a factual landscape cluttered with minutiae. The defendants' reduction in royalty payments to Phoenix forms the basis for the claims asserted by Phoenix. These claims fall within three categories: first, a breach of contract action for failure to pay royalties; second, an action for unjust enrichment based upon the failure to distribute any share of the proceeds of the transfer to CEPE of interest in the Transfer Zone; and third, a catch-all prima facie tort claim alleging that defendants have engaged in a continuing series of acts since 1969 contemplated to destroy Phoenix. The Magistrate recommends that summary judgment be granted in favor of defendants on the first and third causes of action and denied with respect to the unjust enrichment claim. These conclusions and the various sub issues within each category will be considered seriatum.

## II. Breach of Contract Claim.

■ Defendants raise three basic issues in relation to the breach of contract claim:

first, that the underlying agreements contain a forum selection clause which bars litigation in this Court;[12] second, that under choice of law provisions, Ecuadorian law applies to the controversy and would bar the breach of contract action; and third, the act of state doctrine bars plaintiff's claim for continuing royalties under the contract.

### A. Forum Selection Clause

The parties agree that the 1966 Deed contains a clause providing that "all differences which may arise between them shall be discussed at a summary proceeding hearing before any of the Provincial Judges of Pichincha." Dkt. 137A, Ex. 4, Art. 11, A–80.[13] Had this provision been an explicit provision in the 1965 contract, it would almost certainly be considered as a forum selection clause, and could be given effect. *See Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972) (forum selection clause identifying a foreign forum given effect unless shown to be unreasonable); *see also Republic International Corp. v. Amco Engineers, Inc.,* 516 F.2d 161, 168 (9th Cir.1975); *Restatement (Second) of Conflict of Laws* § 80 (1971).

The crux of the issue focuses first on whether the forum selection clause in the 1966 Deed applies as an integral part of the 1965 Contract, and second, whether it applies to this type of dispute. The Magistrate concluded that the forum selection clause should be construed as applying only to disputes regarding the 1966 Deed and therefore it has no application in this case. Plaintiff, understandably, does not challenge the Magistrate's conclusion but noted, in its brief in opposition to defendants' motion for summary judgment, that the issue had been decided by the Court's earlier *forum non conveniens* decision, *Phoenix*

---

**12.** While it might be argued that the forum selection clause, if given effect, would bar any litigation in this Court, including the unjust enrichment and tort claims, since the clause is contractual in nature, it is treated in this portion of the opinion.

**13.** An affidavit submitted by defendants states that the word "discussed" should be read as "resolved." Affidavit of Roque Bustamante Cardenas, Dkt. 136, at 5, n. *. In general, the translations of documents submitted to the Court have not been disputed by either party.

*Canada,* 78 F.R.D. at 457–58, and as such, constitutes the law of the case.[14]

Both parties, nonetheless, submitted diametrically opposed affidavits from Ecuadorian legal experts concerning the effect of the purported forum selection clause. Defendants, with the support of their expert, Roque Bustamante Cardenas, vigorously argue that an unexecuted form of the 1966 Deed was attached to the 1965 Contract and was specifically incorporated by the Contract. Dkt. 137A, Ex. 2, A–47.[15] Plaintiff argues that the clause has only limited application to specific disputes and is, at best, ambiguous. The Magistrate found the argument of Jose M. Rumazo, plaintiff's expert, persuasive but was unwilling to adopt one view over the other. Rather, he based his decision on the nature of the two documents. The Court agrees with the Magistrate's recommendation that the forum selection clause not be given effect in this instance. Furthermore, since this involves essentially a question of foreign law, pursuant to Fed.R.Civ.P. 44.1, the court determines, as a matter of law,[16] that the forum selection clause was not incorporated into the 1965 Contract in such a way to mandate that this dispute be determined by an Ecuadorian court. The basis for this ruling is rather simple: The Bustamante affidavit is cursory and conclusory whereas the Rumazo affidavit furnishes a detailed explanation of Ecuadorian legal principles regarding forum selection clauses. Furthermore, if the parties intended there to be a forum selec-

tion clause applicable to the contractual relationship, they would have done so in the 1965 Contract. Defendants' bootstrap incorporation argument will not overcome the telling absence of such a provision in the corpus of the agreement.

Defendants' objections raise several other arguments which may be disposed of summarily. First, Clause 11 of the 1966 Deed refers to "all differences." Defendants assert that the phrase in the Deed refers to the 1965 Contract simply by its attachment as an annex to the contract. To state the proposition stripped of its adversarial gloss demonstrates its lack of merit. Second, defendants object to the Magistrate's characterization of defendants' motion as one grounded on *forum non conveniens.* While defendants assert the motion is not so grounded, they fail to state any alternative grounds upon which it is grounded. Finally, defendants mistakenly rely on *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), for the proposition that a foreign citizen has no "right" to seek redress in United States courts. *Piper* was a *forum non conveniens* case based on 28 U.S.C. § 1404 and is factually distinct because of the identity of the parties and the existence of American interests.[17]

In conclusion, the forum selection clause pertains to the 1966 Deed and not the 1965 Contract. As such, it has no bearing on the conduct of litigation in this Court with respect to the breach of contract claims.

**14.** In the earlier decision the Court found, on the basis of the affidavits submitted, that the parties had not agreed to adjudication of disputes in a particular forum except those between concessionaires. Phoenix, not being a concessionaire, does not fall within the ambit of the clause and defendants admitted at oral argument that this dispute was not one between concessionaires. *Phoenix Canada,* 78 F.R.D. at 457.

**15.** Clause THIRD(a) of the 1965 Contract provides, in part:

[I]t being understood that the transfer shall be made either under the terms of the project, the text of which has been accepted by the parties and, signed by both, is attached to the present instrument as Annex No. 1.

Dkt. 137A, Ex. 2, A–47. It is significant that Bustamante did not refer to this clause in either of his affidavits, rather the reference comes from defendants' brief in support of their summary judgment motion. *See* Dkt. 136, 163.

**16.** Questions of foreign law are determined by the Court rather than by the fact finder as was the practice before the current version of Fed. R.Civ.P. 44.1.

**17.** In *Piper* all parties except for the manufacturer of the aircraft involved in the accident, which was the subject of the litigation, were Scottish. The accident occurred in Scottish airspace. In the current context, two of the defendants are United States citizens, the plaintiff has significant contact with the United States and, more important, the plaintiff is not Ecuadorian.

**B. The Law Applicable to the Breach of Contract Claim and its Application**

The Magistrate concluded that Ecuadorian legal principles are applicable to the breach of contract claim. He based this conclusion not on vague references in the 1965 Contract and 1966 Deed as asserted by defendants but rather on applicable choice of law principles.[18]

As this action sounds in diversity, this Court must apply Delaware's choice of law provisions. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Generally, Delaware courts apply the rule that the law of the place of contracting governs the validity and construction of a contract. *Pauley Petroleum, Inc. v. Continental Oil Co.,* 43 Del.Ch. 366, 231 A.2d 450, 457 (Del.Ch.1967), *aff'd,* 43 Del.Ch. 516, 239 A.2d 629 (Del.1968). The Delaware Supreme Court, however, indicated a movement toward the adoption of the "most significant relationship" test embodied in section 188 of the *Restatement (Second) of the Law of Conflicts. Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.,* 394 A.2d 1160, 1166 (Del.1978) (citing § 188).[19] Under this test, applying the enumerated factors, Ecuadorian law clearly applies. The place of contracting was Ecuador; virtually all negotiations occurred in Ecuador; the place of performance was both Ecuador and New York; the subject matter of the contract is located in Ecuador; and finally, the domicile, residence, nationality, place of incorporation and place of business of the parties includes Ecuador, Delaware, Texas, New York, Pennsylvania, and Canada. Under either the traditional test or the "most significant relationship" test the applicable law is that of Ecuador.

Plaintiff disputes the conclusion with largely untenable arguments. First, plaintiff contends that validity of neither the 1965 Contract nor the 1966 Deed is at issue and therefore, the law of the place of performance, New York as alleged by plaintiff, rather than the place of contracting, Ecuador, should govern. The Court agrees with the Magistrate's conclusion that validity of the contract and deed is indeed at issue because the validity of deed provisions, the status of CEPE and the construction of the value of oil subject to royalty are implicated in this proceeding. Second, Phoenix claims that Delaware courts have not yet adopted the "most significant relationship" test of section 188. While the Court agrees with the Magistrate that the Delaware Supreme Court has expressed an inclination to adopt this test, this issue need not be addressed since under either test, the applicable law is that of Ecuador. Finally, plaintiff claims that even if section 188 is applicable, the place with the most significant relationship is New York—not Ecuador. Since the only connection with New York comes in the guise of the location where royalty payments were to be made, plaintiff's argument is not persuasive.[20]

Concurring with the Magistrate that the substantive law of Ecuador should be

---

**18.** The Court concurs with the Magistrate and finds what defendants forward as the choice of law provisions as merely exhortary. These clauses simply refer to the companies as "Ecuadorian Companies," and affirm an interest to act in accordance with Ecuadorian law. In the absence of an effective provision, the Court will apply general choice of law principles. *See Restatement (Second) of the Law of Conflicts* § 188.

**19.** *See also Process and Storage Vessels Inc. v. Tank Service Inc.,* 541 F.Supp. 725, 729 (D.Del. 1982); *Sellon v. General Motors Corp.,* 521 F.Supp. 978, 981 (D.Del.1981); *Tew v. Sun Oil Co.,* 407 A.2d 240 (Del.Super.Ct.1979).

**20.** Other elements of plaintiff's protestations on this point are even less convincing. Plaintiff disputes the situs of negotiations as Ecuador.

Apparently one negotiating session occurred in Trinidad and none in New York. Plaintiff argues that the place of contract execution has little relevance in this context because the contract *could have* been executed anywhere and, as such, Phoenix implores the Court to consider the locus of authorization for the contract—New York and Pennsylvania—as dispositive. The Court need only note that the contracts were executed in Ecuador by choice of the parties. Plaintiff also quarrels with the characterization of the subject matter of the lawsuit as oil in Ecuador rather than the right to receive royalty payments in New York. Since the latter is inextricably tied to the former, plaintiff's argument is facile.

applied to the breach of contract claim, the Court now considers his findings regarding that subject. Succinctly stated, the relevant issue concerns the effect and interpretation of Res. 11927 and the Sentencia. As previously noted, defendants requested a ruling from the Ministry regarding the consequences of CEPE's assumption of interest in the Transfer Zone. Defendants rely on Res. 11927, the outcome of this request, as resolving the issue of whether royalty payments need be made on that portion of petroleum production attributable to CEPE's interest in the Transfer Zone. Phoenix, conversely, contends that Res. 11927 was simply a tax ruling without application to the present litigation. Predictably, the opinions of the experts are diametrically opposed.[21]

Plaintiff mounted basically a two-pronged attack on this issue: first, that Res. 11927 and the Sentencia may not be referred to as representing substantive Ecuadorian law; and second, even if valid and applicable, they are subject to interpretative differences which indicate resolution in plaintiff's favor. The Magistrate rejected both general grounds and recommended granting defendants' summary judgment motion with regard to the breach of contract issue.[22]

Phoenix objects to the Magistrate's conclusion that Res. 11927 and the Sentencia bar its breach of contract claim for several reasons: first, Phoenix did not bring the dispute to the Ministry as stated by the Magistrate;[23] second, Res. 11927 is susceptible of differing interpretations; third, the

Minister had no authority to adjudicate the private rights at issue; fourth, since Res. 11927 is ambiguous, it should be construed narrowly as a simple tax ruling; and fifth, the Magistrate failed to deal with certain issues raised by plaintiff regarding the political propriety of Res. 11927. These objections provide the Court with scant assistance. Res. 11927 straightforwardly addresses the issue of the amount of oil production in the Transfer Zone subject to royalty payments. Dkt. 137A, Ex. 23, Art. 6. It expressly refers to the two percent royalty—not the 86 percent tax as plaintiff's construction suggests. The other questions raised by plaintiff largely concern the validity of Res. 11927. These objections directly contravene plaintiff's prior position that "the complaint does not challenge the validity, application or purpose of any law of Ecuador,"[24] a position taken to avoid the strictures placed upon this Court by the act of state doctrine. *See infra* note 27. In fairness to plaintiff, it had taken the position that Res. 11927 was not the substantive law of Ecuador and therefore it was not questioning the validity of Ecuadorian law. This position apparently has been dropped. Nonetheless, plaintiff has failed to proffer any other basis to discern Ecuadorian law distinct from its attacks on defendants' interpretation.[25] Since Res. 11927 is accorded presumptive validity[26] and it expressly addresses the issue, defendants have not breached the contract and the Magistrate's Report and Recommendation regarding this issue will be adopted.

21. The Magistrate correctly finds that while these differing opinions would normally preclude disposition on a summary judgment motion, since questions of foreign law are questions of law, disposition is not only proper but mandated by Fed.R.Civ.P. 44.1.

22. The Magistrate also correctly found that Res. 11927 and the Sentencia were not being forwarded as foreign judgments, but rather as indicative of Ecuadorian law. *See Hilton v. Guyot,* 159 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895).

23. As noted, Phoenix participated in this dispute proceeding and indicated that it shared the same interests as defendants and Banco de

Fomento. Therefore, this factual misstatement bears little impact on the resolution of this matter.

24. *Phoenix Canada,* 78 F.R.D. at 458 (quoting Dkt. 18, at 27).

25. The Bustamante affidavit is far more persuasive than that submitted by Rumazo. The latter simply addressed Res. 11927's status as law, without citation to authority. Dkt. 139 at 3–5. The former, however, discusses the question exhaustively. Dkt. 143, at 4–10.

26. *Phoenix Canada,* 78 F.R.D. at 459 n. 60; *see infra* note 27 and accompanying text.

## C. The Act of State Doctrine

■ Neither plaintiff nor defendants objected to that portion of the Magistrate's Report and Recommendation concerning defendants' claim that the act of state doctrine [27] justifies the grant of summary judgment on the breach of contract claims. Defendants asserted at the hearing, however, that plaintiff effectively attempts to attack Res. 11927, the law of Ecuador, through this Delaware action. This, according to defendants, contravenes the act of state doctrine. The Court has already denied a summary judgment motion based upon the act of state doctrine. *Phoenix Canada,* 78 F.R.D. at 458–59 (treating defendants' motion to dismiss as motion for summary judgment due to the presentation of affidavits). The Magistrate correctly notes that defendants have simply reasserted their prior claims with the support of additional material. The underlying governmental actions, however, remain the same and the newly presented materials fail to persuade the Court to alter its prior ruling.

■ If applicable, a Court utilizes the act of state doctrine to accord a foreign act an irrebuttable presumption of validity and then proceeds to adjudicate the merits of the claim. *See Banco National de Cuba v. Sabbatino,* 376 U.S. at 471–72, 84 S.Ct. at 962–63; *Zweiban v. Mitchell,* 516 F.2d 594, 620 n. 68 (D.C.Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976); *Phoenix Canada,* 78 F.R.D. at 459 n. 60. With this in mind, Res. 11927 and the Sentencia are accorded such a presumption and the only justiciable issues concern the interpretation of the governmental decrees. Plaintiff, however, implicitly attacks the validity of the decrees by arguing first, a lack of authority for the Minister to resolve disputes between private parties; and second, the political machinations of Ecuador's military junta. Plaintiff asks this Court to engage in the very activity forbidden by the act of state doctrine. As such, plaintiff's protestations will be disregarded.[28]

## III. Unjust Enrichment

As the Magistrate's December 11, 1981 Report and Recommendation succinctly states:

Phoenix' [sic] cause of action for unjust enrichment is offered as an alternative remedy if its cause of action for breach of

---

**27.** The act of state doctrine finds its doctrinal underpinnings in *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), which held that courts of one sovereign should not sit in judgment of acts taken by another sovereign. *Id.* at 252, 18 S.Ct. at 84; *see also Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *First Nat'l Citz. Bank v. Banco National de Cuba,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972); *Banco National de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed. 804 (1964); *Restatement (Second) of Foreign Relations Law of the United States* §§ 41–43 (1965). The act of state doctrine is similar to the doctrine of sovereign immunity—both represent principles of judicial restraint which seek to prevent the court from involvement in the area of judging the conduct of a foreign sovereign. The primary distinction between the two doctrines is that the doctrine of sovereign immunity is normally considered in a jurisdictional sense. That is, is the foreign government or its agent immune from suit. It applies only when the sovereign is sought to be made a party to the litigation. *See* 28 U.S.C. § 1602 *et seq.* (Foreign Sovereign Immunities Act); *Outboard Marine Corp. v. Pezetel,* 461 F.Supp. 384, 394

(D.Del.1978). The act of state doctrine, however, applies once a court determines that it has jurisdiction to adjudicate but it focuses entirely on the action of the sovereign and precludes inquiry into the validity of the action. The act of state doctrine is applicable to litigation, such as this instance, between private parties that are affected by the action of a foreign sovereign. *See* H. Steiner & D. Vagts, *Transnational Legal Problems* 672 (2d ed. 1976).

**28.** The Magistrate also opined that the decrees relied upon by defendants do not involve public interests but rather they resolve private corporations' rights and obligations. As such, they are analogous to a judicial decree which normally is not an act of state. *Restatement (Second) Foreign Relations Law of the United States* § 41, comment (d). As that comment notes, whether an action is an act of state depends not on the branch or the agency taking the action, but instead upon its nature as affecting a public interest. Since this determination is not crucial to disposition of the present motion, the Court expresses no opinion on the Magistrate's conclusion.

contract is rejected. Phoenix asserts that if it is not entitled to its contracted for royalty from defendants with respect to that proportion of the oil production from the Transfer Zone transferred to CEPE, it is entitled to an equitable share of compensation defendants received from CEPE for the participation rights.

According to defendants, they are entitled to judgment in their favor on the unjust enrichment claim as a matter of law for the following reasons. First, under choice of law principles the substantive law applicable to the claim is that of Ecuador, and since plaintiff has conceded that Ecuadorian law does not recognize a cause of action for unjust enrichment, the claim must be dismissed. Second, applying recognized principles of unjust enrichment, the undisputed evidence of record is that defendants were not 'enriched' inasmuch as CEPE compensated them only for capital expenditures and equipment and not for oil drilling rights, so that as a matter of law one of the essential elements necessary to establish a cause of action for unjust enrichment is lacking. Third, assuming that CEPE did compensate defendants for taking over their drilling rights, as a matter of law they have not been 'enriched' since the total amount received from CEPE amounted to less than their capital expenditures on the project. Fourth, since Phoenix received everything it bargained for under the 1965 Contract, defendants have not been unjustly enriched by re-ceiving a partial recovery of their own investment.

December 11 Report, at 36–37. Concluding that material issues of fact exist regarding the unjust enrichment claim, the Magistrate recommends that defendants' motion for summary judgment be denied as to this claim. Plaintiff and defendants object to portions of the Magistrate's Report and each has submitted supplementary affidavits of Ecuadorian legal experts. The four aspects enumerated above correspond to the objections raised and will be treated seriatum.

### A. Choice of Law and its Application

■ The Magistrate concluded that Ecuadorian law should govern plaintiff's unjust enrichment claim under choice of law principles. Finding no Delaware decision regarding the determination of applicable law regarding unjust enrichment claims, the Magistrate applied *Restatement (Second) Conflict of Laws* § 221 and concluded Ecuadorian law should be applied.[29] Of the enumerated factors, only one possible nexus to New York City appears: the allegation that Gulf received payment from CEPE in New York. The Magistrate found that Citibank of New York was CEPE's agent and acted merely as a conduit for payment to Mellon Bank, Gulf's agent, in Pittsburgh. Finding the New York connection ephemeral, the Magistrate concluded that Ecuador had a more substantial relationship to the issue than New York.

Plaintiff, without citation to authority, contends that "[t]he most significant factor

---

**29.** Section 221 provides that the law of the state with "the most significant relationship to the occurrence" will govern actions for restitution—the remedy for unjust enrichment. *Restatement (Second) Conflict of Laws* § 221(1). It goes on to enumerate the following factors considered to determine the place of the most significant relationship: first, the place where the relationship between the parties centered, provided the enrichment is substantially related to the relationship; second, the place where the enrichment was received; third, the place where the act conferring the enrichment took place; fourth, the domicile and place of business of the parties; and fifth, the location of the land or chattel which was substantially related to the enrichment. *Id.* § 221(2). The Magistrate found that virtually all factors, as applied herein, point to Ecuadorian law. Plaintiff argues that factual disputes regarding the location of the proceeds of the sale to CEPE exist and that "some" of the funds borrowed by Ecuador to pay defendants came from New York. This amorphous New York contact fails to overcome the Ecuadorian connection. Furthermore, this construction totally ignores the reality of the situation, i.e., that the assets were located in Ecuador and the sale to CEPE took place in Ecuador. Among the parties, CEPE and the subsidiaries are Ecuadorian. Finally, the Court notes that the only substantial connection with New York is the location of counsel.

in an unjust enrichment claim based on the failure to pay a portion of proceeds to which a constructive trust may attach, is the place where the proceeds were received or were held." Dkt. 161, ¶ 56. To a certain extent, plaintiff simply reiterates the point made in section 221 of the *Restatement (Second) of the Law of Conflicts,* that the enumerated factors should be accorded such weight as their relative importance to the transaction mandates. Nonetheless, plaintiff has shown no substantial connection with New York other than the role of Citibank as a conduit. The transaction which gave rise to the alleged unjust enrichment occurred in Ecuador, concerned Ecuadorian property, and payment was made through an Ecuadorian bank. As such, plaintiff's argument seeks to turn conflict principles on their head.

Upon disposing of this threshold issue by adopting the Magistrate's Report and Recommendation, attention may now focus on the more important question: whether Ecuadorian law recognizes a claim for unjust enrichment.[30] The Magistrate assumed the existence of such a cause of action based on the failure of defendants to prove the non-existence of the action.[31] There is no need to go as far as the Magistrate because the parties have supplied affidavits of Ecuado-

rian legal experts regarding the prospects of a claim based upon unjust enrichment under Ecuadorian law. At the outset, the parties' experts agree that the Civil Code of Ecuador contains no specific section allowing such a claim. *See* Reply Affidavit of Roque Bustamante Cardenas, Dkt. 163, ¶¶ 6–8; Affidavit of Rene Bustamante Munoz, Dkt. 167, ¶ 7. The parties differ, however, as to whether such an action remains viable under other principles embodied by Ecuadorian legal concepts.

■ Defendants' expert states a general principle regarding civil law jurisdictions in the following passage:

> Since Ecuador is a civil law jurisdiction, the rights and remedies available to litigants are only those which are set forth in Ecuador's legal codes, statutes and regulations or provided for by contract between the parties.

> \* \* \* \* \* \*

> Because there is no provision in the Ecuadorian legal codes, statutes or regulations nor in the parties' contractual arrangements that would entitle Phoenix to a share of the lump sum payments made by CEPE to defendants, Phoenix's claim to such a share, if it were brought under

---

**30.** Defendants argue that plaintiff conceded that the law of Ecuador fails to recognize unjust enrichment when, at the oral argument on defendants' *forum non conveniens* motion, plaintiff stated that "there is no body of common law equity principles to support a claim for unjust enrichment." Dkt. 13, at 50–51. The Court agrees with the Magistrate's conclusion that this statement was not intended as a concession and will not be considered as such.

Raising the adversarial fracas to even higher heights, plaintiff argues that Ecuadorian law should not be applied because neither it nor the Court were sufficiently apprised of the substantive law. Rather than parse the volte-faces of each party, the Court simply notes that various affidavits now before the Court address Ecuadorian legal principles regarding unjust enrichment, and that Fed.R.Civ.P. 44.1 authorizes the Court to undertake a sua sponte investigation of foreign law. As one commentator notes:

> Once an issue about a certain country's law has been raised, the proof offered by that party should not be limited to the particular statutes or decisions that may have been identified in that notice. An adverse party

cannot complain if the court looks beyond those references to other portions of the applicable law or if the party who gave notice seeks to support his position with additional materials.

C. Wright & C. Miller, *Federal Practice and Procedure* § 2444, at 407 (footnote omitted). Furthermore, the notice afforded need not be specific. *Id.* § 2443, at 403. The Court has determined that Ecuador recognizes such a cause of action even though the parameters remain undefined at this juncture. *See infra* pp. 1383–1384 and accompanying notes.

**31.** As the moving party, defendants bear the burden of proving foreign law. Fed.R.Civ.P. 44.1; *see* C. Wright & C. Miller, *Federal Practice and Procedure* § 2447, at 415–16. While the failure to prove foreign law may result in application of the domestic law of the forum on the assumption that foreign law would be the same, this procedure has limited application to cases involving a total lack of exposition of foreign law—a situation distinct from this case. *See Bowman v. Grolsche Bierbrouwerij B.V.,* 474 F.Supp. 725 (D.Conn.1979).

the law of Ecuador, would be dismissed as a matter of law.

Supplemental Affidavit of Roque Bustamante Cardenas, Dkt. 163, ¶ 8. In general, the codes of a civil law country provide all the rights and remedies available to litigants. If a cause of action is not provided for in the code, it will be unavailable. This premise ensues from the fundamental distinction between common law and civil law jurisdiction: the former permits courts to fashion law and remedies while the latter permits courts only to apply and interpret the code as a comprehensive entity. *See generally* R. Schlesinger, *Comparative Law* 410, 433–41 (3d ed. 1970). On the other hand, the absence of a specific provision in a civil code will not eliminate a cause of action if recourse may be made to more generalized provisions. *Id.* at 894–95 [32] (discussing use of analogies and general principles to fill gaps in civil codes).

■ The affidavit submitted by plaintiff provides an exhaustive analysis of the concept of unjust enrichment as embodied by the Ecuadorian constitution, the Civil and Commercial Codes, court precedents and embraced by legal scholars. Affidavit of Rene Bustamante Munoz, Dkt. 167, ¶¶ 7–10. This affidavit traces the concept that "one may not become richer at the expense of another" through the codification and interpretation of Ecuadorian law.[33] The concept of unjust enrichment—basically an equitable premise—structurally forms the basis for theories of quasi contract. Since the Civil Code of Ecuador recognizes such an action, the general principle of unjust enrichment must also be considered applicable.

In conclusion, defendants have failed to prove the non-existence of the availability of unjust enrichment as a cognizable claim under Ecuadorian law. The absence of a specific code provision has little bearing when general principles and interpretation indicate recognition of the theory and these latter embodiments of Ecuadorian law remain unchallenged. Even though a fundamental premise of civil law systems considers law or remedy making by the judiciary an anathema, civil law courts, nonetheless, often fill the interstices of civil codes by recourse to general principles or "customary" principles. The Court finds that a reasonable basis exists to conclude that Ecuadorian law recognizes the concept of unjust enrichment.

**B. Compensation to Defendants as Reflecting only Asset and Equipment Value**

■ Defendants strenuously contend that they were not "enriched" by CEPE's assumption of participation in the Transfer Zone because no payment was made for oil drilling rights. Rather, payment to defendants was based solely on capital investment and equipment costs. *See supra* notes 8, 9. The Magistrate recommended a denial of defendants' motion for summary judgment on this ground because ambiguities in the agreements between CEPE and defendants permit the conclusion that defendants were compensated for their drilling rights.

Defendants object to the Magistrate's conclusion because compensation was solely limited to depreciated value of assets yet the Magistrate considered the intent of the parties. Defendants' objections fail to specifically refute the Magistrate's findings regarding the ambiguous nature of the contractual language and leaves the Court in somewhat of a quandary. It may well be that the language utilized was broader than the test for compensation employed.[34] At

---

**32.** It should be noted that even in common law jurisdiction if a cause of action is asserted which does not fall within a recognized category of action, courts will dismiss unless generalized concepts can be culled from other areas to articulate a rationale to permit assertion of the claim.

**33.** The affidavit also refers to legal principles of other countries. At first blush such a reference may appear irrelevant, however, because civil codes are patterned closely after one another,

generally those with a common heritage may be considered for guidance and analogy.

**34.** The Magistrate concluded that the 1974 and 1977 agreements speak in terms of "rights *and* obligations," "rights *and* assets" and "*Totality* of its rights over the assets." (emphasis added). Even though the audits established the value of equipment and this value was utilized as the measure of CEPE's payment, the agreements surely referred to broader principles.

this time, however, the Court agrees with the Magistrate that summary judgment is inappropriate.

### C. Lack of Enrichment Based Upon Amount of Compensation

Defendants argue that even if the compensation received from CEPE reflected the value of oil drilling rights, no enrichment occurred since they only received the depreciated value of their capital assets. Under this theory, since defendants allegedly spent more than they obtained, Phoenix could obtain only a proportional amount of the net benefit—here zero. The Magistrate rejected this argument on the basis that defendants had derived substantial profits thereby receiving a return on their capital investment. Since a material dispute exists concerning whether the amount received from CEPE constituted a return over and above capital investment, the Magistrate concluded that summary judgment should be denied.

Defendants object to this conclusion stating it constitutes abject speculation and is irrelevant.[35] They further assert that plaintiff derived substantial royalty payments in the period preceding CEPE's participation.[36] Plaintiff correctly notes that the amount of profit or loss bears little relation to this controversy since plaintiff's allegation concerns an asserted right to receive compensation for the loss of oil producing property subject to royalty payments.[37] Even though defendants enjoyed the right to assign their interests, since any assignee, other than CEPE, would also assume the obligation to make royalty payments, a material dispute exists as to whether defendants are liable on unjust enrichment grounds. Since it remains unclear as to whether defendants realized a gain upon transfer to CEPE, regardless of the measure used to calculate the amount CEPE would pay, the Magistrate's conclusion will be adopted and the summary judgment motion denied as to these grounds.

### D. Benefit of the Bargain

As a last line of defense in support of its motion for summary judgment as to Phoenix's unjust enrichment claim, defendants argue that Phoenix cannot recover under such a theory because they received precisely what they bargained for. According to defendants, the royalty payments related only to that oil sold or produced by defendants, that if production ceased, no payments need be made, and defendants could freely assign their rights to the government or any other person. The events that occurred, defendants maintain, simply reflect the contingencies provided for in the 1965 Contract and 1966 Deed. The Magistrate summarily dismissed this contention because it fails to consider two contingencies: first, a lump sum payment for any such assignment; and second, governmental action abrogating Phoenix's right to receive royalty payments.

Defendants predictably object on the basis that plaintiff would have the Court rewrite the contracts to allow an unjust enrichment claim. Despite their protestations, the agreement entered by the parties provided for some, but not these particular,

---

*See* Dkt. 137B, p. A–219, A–220; Dkt. 137C, p. A–377.

**35.** Defendants simply state that the method employed to calculate CEPE's payment presumptively demonstrates that the net benefit was zero. This remains unclear and the cases cited in defendants' brief in support of their summary judgment motion shed little light on the problem. None of those cases addresses the issue here presented: whether a benefit was gleaned from past returns on investment which renders the measure of payment based on depreciated value actually reflective of capital returns, thereby resulting in a benefit.

**36.** Defendants also refer to royalty payments currently being received by Norsul and Phoenix. Since these payments reflect those producing regions not transferred to CEPE, these payments are irrelevant. What is relevant concerns the simple conclusion that had CEPE not assumed a participatory interest, the royalty payments would be much greater.

**37.** Upon initial consideration, defendants' contentions that their net benefit was zero and, hence, no enrichment occurred, appears attractive. Upon reflection, however, it is indisputable that defendants were extricated in such a way to recoup something while plaintiff recovered nothing.

contingencies. As such the Magistrate's reasoning is sound and will be applied.[38]

In conclusion, Ecuadorian law is applicable and recognizes the unjust enrichment claim; material factual disputes exist regarding the assets for which compensation was received; material factual disputes exist regarding whether defendants received a benefit; and material factual disputes exist as to whether the contract precludes the claim. The Court is well aware of defendants' allusion to the United States Court of Appeals for the Third Circuit's treatment of Fed.R.Civ.P. 56(e). Despite defendants' characterization, plaintiff has not asserted an impermissible lack of knowledge by not providing a detailed treatment of the Ecuadorian law because Phoenix has maintained throughout the proceeding that Ecuadorian law was inapplicable to this claim. While the affidavit of Rene Bustamante Munoz contains an exposition of the possible bases for a claim of unjust enrichment, the application and parameters of the substantive nature of the claim have not been delineated. While this failure of the plaintiff to

offer an alternative framework for analysis is unfortunate, it should by no means deprive the plaintiff of its cause of action. The Court decides today only that Ecuadorian law applies and does not bar the claim. In the absence of further development of Ecuadorian law,[39] the Court may presume that the body of law would be identical to the law of the forum.[40]

## IV. Prima Facie Tort Claim

The third basic theory asserted by Phoenix in its complaint concerns an allegation that defendants engaged in a continuing scheme to destroy it as an economic entity.[41] The Magistrate's December 11 Report requested additional briefing concerning the issue of whether plaintiff's claim was time barred. Briefs were submitted and the Magistrate issued his second report on May 7, 1982. That Report concluded the tort claim was time barred with respect to acts of defendants occurring before November 26, 1973, and that the subsequent acts do not state a cause of action in tort. The Magistrate considered several aspects of

---

**38.** Defendants also assert an insufficient showing of Ecuadorian legal principles regarding this claim. Since the effect of this ruling is to apply Ecuadorian law to the claim, the parties are expected to develop the applicable principles. The Court holds that Ecuador clearly recognizes the theory of unjust enrichment. The extent of recovery as the theory is applied in this case, however, currently remains unclear.

**39.** The Court is, of course, free to utilize resources at its disposal to conduct a non-partisan inquiry into substantive Ecuadorian law concerning the application of the theory of unjust enrichment to the facts of this case, and has done so. By letter dated December 30, 1982 the Court requested the assistance of the Library of Congress regarding the existence and parameters of a claim for unjust enrichment under Ecuadorian law. If and when the Court receives a response to this request, the parties will be notified and, pursuant to the preferred procedure under Fed.R.Civ.P. 44.1, the parties will be afforded a limited opportunity to comment. In any case, it is expected that the parties will begin to address the specific application of Ecuadorian law to plaintiff's unjust enrichment claim in anticipation of trial.

**40.** The law of Delaware, the forum, would be the alternative body of legal principles—not that of New York as contended by plaintiff.

*See Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 452 F.Supp. 1108, 1112 n. 3 (S.D.N.Y.1978), *remanded,* 607 F.2d 994 (2d Cir.1979); *cf. Symonette Shipyards, Ltd. v. Clark,* 365 F.2d 464, 468 n. 5 (5th Cir.1966), *cert. denied,* 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967) (prior to current version of Fed.R.Civ.P. 44.1); *Segusos Tepeyac, S.A., Compania Mexicana de Seguros Generales v. Bostrom,* 347 F.2d 168, 174 n. 3 (5th Cir.1965) (same); C. Wright & A. Miller, *Federal Practice and Procedure,* § 2447, at 416. *But cf. Bowman v. Grolsche Bierbrouwerij B.V.,* 474 F.Supp. at 730 (applies law of place of performance; however place of performance same as forum).

**41.** For example, plaintiff's Complaint alleges:

Commencing about 1969, and continuing to the present, in New York, Florida and elsewhere, the defendants agreed upon, developed and implemented plans, schemes and a conspiracy to eliminate or impair plaintiff's gross royalty interest, to destroy plaintiff as a going concern, to remove plaintiff as a competitor in Ecuador and elsewhere and to reap whatever financial benefits would flow therefrom as more fully alleged hereafter.

Dkt. 1, ¶ 17.

this cause of action: first, the underlying facts; second, the applicable statute of limitations; and third, the substantive nature of the tort.

### A. Facts Underlying the Prima Facie Tort Claim

In support of the general allegation that defendants attempted to destroy plaintiff as a participant in the oil production business, the complaint lists a series of specific acts beginning in 1969. Several of the individual acts contain allegations of injury. The Magistrate summarized these as follows:

Defendants made false claims that certain oil-producing lands were not within the area of the concession. This caused injury because trading in Norsul stock was suspended by the SEC and the value of the stock plummeted, hampering Plaintiff's efforts to raise capital. [Dkt. 1, at ¶ 18.]

Defendants made unjustified requests to Plaintiff for documentation to prove Plaintiff's right and title to royalties, causing waste of corporate assets and obstructing Plaintiff's opportunity to conclude financing. [*Id.* at ¶ 22].

Defendants made false statements about Plaintiff on Ecuador TV which were prominently reported in Ecuador and which impaired Plaintiff's ability to obtain new financing. [*Id.* at ¶¶ 27–28].

Defendants were guilty of unjustified delays in making royalty payments in 1972–1973. [*Id.* at ¶¶ 31–34, 40].

Defendants made unjustified demands for a new written agreement in 1973. [*Id.* at ¶¶ 36–39].

Defendants wrongfully utilized special funds. [*Id.* at ¶ 42].

Defendants made false and malicious statements about Plaintiff to third parties in May 1972-May 1973. [*Id.* at ¶ 44].

All royalties were withheld by Defendant Texaco on February 26, 1973 without justification, causing a decline in Plaintiff's stock value and endangering its credibility in the market. [*Id.* at ¶ 46].

Defendants failed to make royalty payments due April 30, 1973. [*Id.* at ¶ 49].

Defendants improperly retroactively applied a selective 86% tax to previous oil production, injuring Plaintiff's credibility and impairing its stock value and its ability to raise capital. [*Id.* at ¶¶ 50–51].

Defendants made unjustified reductions in payments commencing on July 8, 1973. [*Id.* at ¶ 57].

Defendants failed to properly calculate royalty payments in the Fourth Quarter of 1973 through the Second Quarter of 1974. [*Id.* at ¶¶ 58(b)(3) ].

Defendants have failed to pay Plaintiff since June 8, 1974 an equitable portion of the proceeds from CEPE's acquisition of a 25% interest in the consortium and have unlawfully deducted 25% from gross royalty payments due and owing since that time. [*Id.* at ¶¶ 62–64].

Defendants have failed to pay Plaintiff since January 1, 1977 an equitable portion of the proceeds from CEPE's acquisition of a 37.5% interest in the original consortium and have unlawfully deducted 37.5% from gross royalty payments since that time. [*Id.* at ¶ 82].

May 7 Report, at 2–4.

As the Magistrate notes, all but the last four of the alleged incidents occurred prior to November 26, 1973.

### B. Statute of Limitations

The Magistrate concluded that, in a diversity action, the applicable statute of limitations is that applicable had the action been brought in state court. *Freedman v. Beneficial Corp.,* 406 F.Supp. 917, 921 (D.Del.1975). Under Delaware law, tort claims without accompanying force must be brought within three years from the accrual of the cause of injury. 10 *Del.C.* § 8106. Since the alleged actions occurred outside of Delaware, the shorter of two limitation periods applies, *i.e.,* that of Delaware or that of the state in which the cause of action arose. 10 *Del.C.* § 8121. Therefore, three years is the maximum applicable limitation period.[42] Neither party disputes this conclusion.

---

**42.** The Magistrate also correctly concluded that the time of accrual of the cause of action will

be governed by the rules applicable had the action been brought in state court. *Pioneer*

Plaintiff objects, however, to the Magistrate's conclusion that the statute of limitations relative to each act alleged as the basis for the tort runs separately from the time of injury caused by each act. As such, acts prior to the date upon which the limitation period began to run are time barred.

## C. Substantive Nature of the Tort

The Magistrate reached several conclusions concerning the nature of the prima facie tort: first, that no cause of action exists for a civil conspiracy; second, therefore, the statute of limitations runs from each act; and third, that the acts not time barred fail to state a cause of action. Plaintiff takes issue with each of these conclusions.

▬▬ Delaware courts do not recognize independent actions for civil conspiracies. *Henis v. Compania Agricola De Gustenada,* 116 F.Supp. 223, 225, 226–27 (D.Del.1955), *aff'd,* 210 F.2d 950 (3d Cir. 1954); *Park-In Theaters v. Paramount-Richards Theaters,* 90 F.Supp. 727, 729 (D.Del.), *aff'd,* 185 F.2d 407 (3d Cir.1950), *cert. denied,* 341 U.S. 950, 71 S.Ct. 1017, 95 L.Ed. 1373 (1951).[43] A suit may not be maintained for acts committed that are barred by the statute of limitations simply by asserting that injury did not occur until a later time. *See Glassberg v. Boyd,* 35 Del.Ch. 293, 116 A.2d 711, 717 (Del.Ch.1955)

(allowance of such suits effectively tolls the statute of limitations in an impermissible manner). Phoenix seeks to avoid this construction first by alleging that the Magistrate misconstrued its claim as one for a conspiracy.[44] Phoenix asserts that the acts failed to cause either actual damage or "the *kind* of injury about which plaintiff is complaining." Dkt. 161, at 11 (emphasis in original). Therefore, absent injury, the accrual of action did not occur. This objection fails to recognize the clear allegations of specific injury associated with the specific acts of the defendants. *See Phoenix Canada,* 78 F.R.D. at 450–51 (conclusion that Phoenix attributed specific injury to individual acts).

Phoenix attempts to avoid this result by characterizing its claim as one for intentional infliction of economic injury and alleges that under this theory, each individual injury would be insufficient to maintain the claim because the actual injury—destruction of the business—had not yet occurred. In effect, Phoenix argues that this tort evolves from a series of indivisible wrongs which accrue into a claim upon the last act asserted in the chain of events. The simple answer to this theory is that such a construction circumvents the statute of limitations, rendering it a nullity.[45]

▬▬ More specifically, however, the Magistrate concluded that the courts of New York fail to consider this cause of action an indivisible tort.[46] While authority

---

*Nat'l Title Ins. Co. v. Sabo,* 432 F.Supp. 76, 78 (D.Del.1977). Delaware choice of law principles require application of the place where the tort arose. *Friday v. Smoot,* 211 A.2d 594, 595 (Del.1965); *cf. Paoletto v. Beech Aircraft Co.,* 464 F.2d 976, 979 (3d Cir.1972) (if place of act and place of injury differ, latter controls); *Zahn v. Transamerica Co.,* 162 F.2d 36, 40 (3d Cir.1947) (substantive law applicable of place of last necessary act to complete tort).

**43.** Pursuant to Delaware law, the existence of a civil conspiracy has only two effects: first, to implicate others; and second, to increase the measure of damages. *See Laventhol, Krekstein, Horwarth and Horwarth v. Tackmon,* 372 A.2d 168, 170 (Del.1976).

**44.** This, of course, ignores the plain language of paragraph 17 of the Complaint. Dkt. 1, ¶ 17.

**45.** Defendants also respond that since Phoenix remains a viable entity, the assertion of the tort

may not be maintained. The Court finds this contention meritless because the gravamen of the tort is the infliction of economic injury— not necessarily destruction. *Cf.* W. Prosser, *Torts* § 130, at 953 (4th ed. 1971) (tortious interference with prospective advantage concerns economic harm based upon intentional interference coupled with some damage).

**46.** Delaware courts have recognized the tort of deliberate interference with prospective business opportunity. *See DeBonaventura v. Nationwide Mut. Ins. Co.,* 428 A.2d 1151 (Del. 1981). Delaware courts have neither adopted the theory of an indivisible tort nor that of independent civil conspiracy. *See supra* note 43. Delaware, as a *lex loci delicti* state, applies the law of the state where the last act occurs which completes the tort. *See Tew v. Sun Oil Co.,* 407 A.2d 240 (Del.Super.Ct.1979). Applying these principles, the Magistrate concurred with Phoenix's uncontested contention that

exists for the recognition of such a cause of action under New York law, the cases fail to remove cases of this genre, based upon a series of acts, from application of the statute of limitations. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187 (2d Cir.1943) (no indication that alleged acts fell outside period of limitation). Plaintiff objects to this construction and asserts that *Original Ballet Russe* stands for proposition that an indivisible tort exists. While the court in that case did determine that the tort exists and each act need not be pleaded separately, it failed to consider the instant proposition concerning actions occurring outside the limitations period.[47] New York courts have specifically addressed the question of accrual of continuing torts and have concluded that the statute of limitations runs with respect to each act when it occurs. *Kory v. International Telephone & Telegraph Corp.,* 444 F.Supp. 193, 195 (S.D. N.Y.1938).[48] In conclusion, since the three-year limitation period constitutes the maximum applicable, the Magistrate correctly concluded that acts occurring prior to November 26, 1973 are barred as a matter of law.

With these contentions disposed of, the four post-November 26, 1975 acts remain as asserted. The Magistrate concluded that the specific acts constituted mere breaches of contract which fail to state a cause of action in tort. *See Rich v. N.Y. Central &*

*Hudson R.R. Co.,* 87 N.Y. 382, 393–97 (1982) (to state a claim in tort based upon a contract breach, the breach must be the primary means of inflicting another, and separate harm); *see also Luxomony Cars, Inc. v. Citibank, N.A.,* 65 A.D.2d 549, 408 N.Y.S.2d 951, 954 (2d Dept.1978); *Wegman v. Dairylea Cooperative, Inc.,* 50 A.D.2d 108, 376 N.Y.S.2d 728, 734 (9th Dept.1975).[49]

Phoenix objects to this conclusion by stating that the pre-1973 acts should be considered as the basis upon which to show the separate and distinct motive. This objection might be construed to recognize implicitly that the four post-1973 alleged acts fail to state a claim in tort. Contrary to Phoenix's contention, the Magistrate did not determine that time barred acts could not be utilized to establish a tort that is not time barred.[50] He simply concluded that the prior acts cannot be relied upon to transform a breach of contract claim into a tort claim. To allow such a metamorphosis effectively extinguishes the distinction between contract and tort, vitiates the statute of limitations, and, through artful pleading, resurrects a claim which could not be brought. This toe-hold approach to litigation has no place in this jurisdiction.[51]

In conclusion, the Court agrees with the Magistrate's conclusion that the prima facie tort claim based on acts prior to November 26, 1973 is time barred. In addition, while an action based on the post-November 26,

New York law governs. Because the conclusion is not contested, the Court assumes, without deciding, that New York law governs.

**47.** The other cases cited in support of plaintiff's theory which discussed *Original Ballet Russe* were civil antitrust cases which, by their very nature, are premised upon a conspiracy. *Cardinal Films v. Republic Pictures Corp.,* 148 F.Supp. 156 (S.D.N.Y.1957); *Winkler-Koch Eng'r Co. v. Universal Oil Products Co.,* 96 F.Supp. 1014 (S.D.N.Y.1950). As such, these cases are inapposite.

**48.** Delaware courts apply the same rule. *Glassberg v. Boyd,* 116 A.2d at 717.

**49.** The four acts concern: first, unjustified resolutions in royalty payments; second, improper calculation of royalty payments; third, failure to remit a portion of the proceeds from the first sale to CEPE; and fourth, failure to remit a

portion of the proceeds from the second sale to CEPE. *See supra* p. 1387.

**50.** Phoenix correctly notes that the statute of limitation acts only to bar assertion of a cause of action. It does not extinguish the claim. This, nonetheless, has no bearing in the current context because the claim, as asserted by Phoenix, is not cognizable under the law of either New York or Delaware. *See* note 46, *supra,* and accompanying text.

**51.** Phoenix makes the blanket assertion that "[P]laintiff has alleged and can prove at the trial that the breaches of contract which occurred after November 26, 1973, were part of a tortious conspiracy to injure plaintiff." Dkt. 161, at 14–15. Such an assertion, absent a basis in admissible evidence, does not form the basis upon which the Court can deny summary judgment pursuant to Fed.R.Civ.P. 56.

1973 acts is not time barred, these acts fail to state a cognizable cause of action.

## V. Conclusion

The Magistrate has done a laudable job in making sense of a hopelessly confused morass. In large part, the Court adopts his conclusions and this opinion primarily seeks to amplify those conclusions. Both parties, in their adversarial zeal, have made largely specious attacks on the Magistrate's findings and conclusions. Such tactics seldomly bear fruit, they simply add to the cost of litigation and the exponential expansion of paper.

In conclusion, the Court, pursuant to Fed. R.Civ.P. 56(d), will grant partial summary judgment based upon defendants' motion with respect to the contract and prima facie tort claims. Summary judgment will be denied with respect to the unjust enrichment cause of action.