842 F.2d 1466
 PHOENIX CANADA OIL COMPANY LIMITED, Appellant in No. 87-3389,
v.
TEXACO, INC., Texaco Petroleum Company, Ecuadorian Gulf Oil
Company, and Gulf Oil Corporation, now, by Change
of Name, Chevron, U.S.A., Inc.
Appeal of TEXACO PETROLEUM COMPANY and Ecuadorian Gulf Oil
Company, Appellants in No. 87-3375.
 Nos. 87-3375, 87-3389.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 3, 1987.
Decided March 30, 1988.
Rehearing and Rehearing In Banc Denied April 26, 1988.
 
 Victor P. Muskin (argued), Sally L. Schneider, Gruen, Muskin & Thau, New York City, Hughes & Sisk, Wilmington, Del., for Phoenix Canada Oil Co. Ltd.
 Milton Sherman (argued), Milton J. Schubin, Myron Kirschbaum, Scott M. Berman, Kaye, Scholer, Fierman, Hays & Handler, New York City, Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Gulf Oil Corp., Texaco Petroleum Co., and Ecuadorian Gulf Oil Co.
 Lawrence R. Jerz, White Plains, N.Y., for Texaco Petroleum Co.
 Before WEIS, HIGGINBOTHAM and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 As the beneficiary of a royalty arrangement, plaintiff Phoenix seeks compensation for its proportionate share of oil production rights in Ecuador which defendant oil companies allegedly conveyed to that government. The district court found that Ecuador had paid defendants only for unamortized capital assets and supplies but nothing for production rights. Consequently, plaintiff did not succeed on that claim. The district court, however, did award plaintiff damages for past-due royalties which had been earned but calculated improperly, finding only defendant subsidiaries liable, not their parent corporations. We will remand for further factual development of a possible agency relationship between parent and subsidiary corporations, but otherwise will affirm.
 
 
 2
 After a nonjury trial, the district court entered judgment against plaintiff Phoenix Canada Oil Company, Ltd. on its claim for recovery of the value of petroleum production rights, and in favor of Phoenix on its claim for payment of past-due production royalties. The automatic stay provision of the Bankruptcy Code, 11 U.S.C. Sec. 362, precluded entry of a final judgment as to defendant Texaco, Inc. However, the district court entered judgment with respect to the other three defendants, certifying there was no cause for delay.
 
 
 3
 Phoenix's predecessors obtained a concession from the Government of Ecuador to explore for oil in the eastern lowlands of that South American country. Subsequently, Phoenix and a Canadian co-venturer succeeded to these exploration rights, and they, in turn, assigned a portion of their concession territory to Gulf and Texaco in exchange for an immediate cash payment and a royalty on any oil extracted. Although Gulf and Texaco successfully produced oil in the assigned territory, a series of government actions reduced the profitability of the venture, and Gulf eventually sold its interest back to the Ecuadorian government. As a result of this sale, Phoenix's royalty base was reduced significantly. Phoenix brought this suit to recover damages for its lost royalty interests.
 
 I.
 
 4
 In 1961, the Ecuadorian government granted Minas y Petroleos del Ecuador a concession to explore for oil and, if discovered, exploit the reserves found in an eleven million acre tract. In 1965, Minas entered into a contract with a consortium of Gulf and Texaco subsidiaries. Under the provisions of the agreement, the subsidiaries succeeded to Minas' exploitation rights in a portion of the original concession, a large area of land identified in the contract as the "Coca Concession".[1] In return, the subsidiaries made a cash payment to Minas' two corporate owners, Phoenix and Norsul,[2] agreeing to pay a royalty calculated at two-percent of the net value of any crude oil or natural gas produced from the area. The government formally approved the transfer, but was not informed of the two-percent royalty arrangement.
 
 
 5
 Oil was discovered in the Coca Concession in 1969, and actual production began in 1972. To transport the crude to market, the Gulf-Texaco consortium financed and constructed a 318-mile pipeline across the Andes Mountains down to the Pacific Coast. The pipeline cost the consortium $108 million.
 
 
 6
 Following the 1969 announcement that oil had been discovered, the government required renegotiation of all concession arrangements. The Coca Concession consequently was reduced in area, and the government royalties were nearly doubled from 6% to 11.5%.
 
 
 7
 In 1971, Ecuador enacted the new Hydrocarbons Law which declared that "[t]he deposits of hydrocarbons and accompanying substances ... located in the national territory ... belong to the inalienable and imprescriptible patrimony of the State." Although originally enacted to be prospective in effect, the new law was made retroactive when a military government took power in 1972.
 
 
 8
 The 1971 Hydrocarbons Law further reduced the size of concessions and again raised the government's royalty. In addition, the statute provided that the government's royalty and income taxes would henceforth be computed for all producers on the basis of a uniform "reference price", which could be set either by agreement with the producers or unilaterally by the government. The law also mandated governmental participation in oil production through "association contracts" to which the national oil agency, Corporacion Estatal Petrolera Ecuatoriana (CEPE), would be made a party.
 
 
 9
 The consortium requested indemnification from the government for the area that had been returned in compliance with the Hydrocarbons Law. The government refused, explaining that the payment of compensation for the return of "the inalienable interests of the Nation" was inconsistent with the petroleum policy of the "Nationalistic and Revolutionary Government of the Armed Forces."
 
 
 10
 Citing the increasing costs of doing business under the new military government, the consortium insisted that the original provisions of the 1965 contract had been frustrated and demanded renegotiation of the two-percent royalty proviso with Phoenix. In early 1973, the parties reached an "Interim Agreement" to govern the calculation of the royalty payments due for the last two quarters of 1972 and the first quarter of 1973. This document, however, stipulated that the signatories were not waiving their rights under the original 1965 contract.
 
 
 11
 Although the Interim Agreement expired after the first quarter of 1973, its terms were followed through the third quarter of 1973. A dispute between the parties arose when the consortium continued to calculate the two-percent royalty under the Interim Agreement for the final quarter of 1973 and the first and second quarters of 1974. The district court's ruling on that point is one of the issues in this appeal.
 
 
 12
 The Interim Agreement renegotiation drew the government's attention to the previously unknown two-percent royalty arrangement. The Ecuadorian Natural Resources Minister reacted with hostility to the news of the discovery, declaring it an "illegal" and "immoral" attempt to partition a national resource belonging inalienably to the people of Ecuador. Rather than voiding the royalty outright, as the Resources Minister urged, the government instead imposed an 86% retroactive tax on the payment of the two-percent royalties.
 
 
 13
 In 1973 the government issued a decree establishing the terms of a new model contract, which the consortium and other oil producers were bound to accept in lieu of existing agreements. The model contract granted CEPE the right to acquire up to a 25% participation in the "rights and actions conferred in this contract and in the assets acquired by the contractors for purposes of this agreement." Also included were a tax reference price unilaterally set by the government, a provision shortening the Coca Concession exploitation period, and an expansion of state-imposed discounts for oil purchased for domestic use in Ecuador.
 
 
 14
 Consortium efforts to negotiate a mutually advantageous purchase price for the 25% interest proved unavailing. Instead, the government stated flatly that CEPE would begin its 25% participation on June 6, 1974 and that compensation would be computed on the basis of net book value, or the unrecovered actual investment in producing and pipeline assets. An independent auditor was engaged to establish the exact value of the unrecovered investment. The government rejected the consortium's request to be paid for future production rights lost as a consequence of the transfer.
 
 
 15
 The following year, a resolution announced that CEPE would not pay for its proportionate share of the cost of the pipeline. In conducting its 1976 audit, Peat, Marwick, Mitchell & Company excluded the pipeline expenditures and calculated the net book value of the consortium's investment at $182 million. Over a nearly five-year period, Ecuador paid the consortium one-fourth of this sum, or a total of $45,033,671. No interest was paid for the delay.
 
 
 16
 While the CEPE acquisition proceeded, other significant events were taking place as well. In June 1974, the government issued Resolution 11927 to clarify the two-percent royalty due Phoenix and Norsul from the consortium. The expressed purposes of this resolution were to "terminate the disagreements arising out of the assessment and payment of two-percent of the net production" and to "establish with certainty the taxable base which generates the [86%] income tax."
 
 
 17
 The Resolution imposed an additional requirement that Phoenix and Norsul invest at least half of their remaining 14% after-tax royalty payments in Ecuador. The Resolution also provided that CEPE's newly acquired 25% interest "be excluded, in order to carry out the assessment of the 2%." When challenged by Texaco, the Resolution was affirmed by a Ministerial Sentencia in October 1974.
 
 
 18
 In the years that followed, the government of Ecuador took other drastic steps which further diminished the profitability of the consortium's Coca Concession venture. One new requirement directed that the consortium deposit all export proceeds with the Ecuadorian Central Bank in order to ensure the government its petroleum royalties.
 
 
 19
 Income tax rates rose to 71.5% in 1975. Ecuador nearly tripled its government oil royalty to 17%, announcing that the royalty would be computed on the basis of "presumed", rather than actual, petroleum production. The figure the government assigned to this "presumed" production not only exceeded actual output, but was greater than the maximum volume of oil the consortium was legally permitted to produce. Finally, CEPE began extracting and selling more than its 25% share of crude, without the authorization of, or compensation to, the consortium. When Gulf protested these practices, the state threatened forfeiture.
 
 
 20
 When its relationship with the government continued to deteriorate, Gulf decided to withdraw from the consortium by selling its remaining 37.5% interest[3] to CEPE. The sale price was to be calculated on the basis of the unrecovered actual cost of Gulf's investment in producing assets, its materials and supplies inventory, and its undepreciated and unamortized interest in the pipeline. The accounting firm of Deloitte, Haskins and Sells performed the audit on Gulf's assets, listing its total share as $118 million.
 
 
 21
 CEPE made two payments to Gulf: one in May 1977 and a second in April 1979. No part of these payments was forwarded to Phoenix or Norsul. Following CEPE's acquisition of Gulf's Coca Concession interest, Gulf ceased paying royalties to Phoenix and Norsul. Texaco, however, continued its petroleum production activities on the Coca Concession and continues to pay its 37.5% share of the royalties.
 
 
 22
 Phoenix brought this suit in 1976, contending that the consortium's 25% sale to CEPE included payment for lost production rights. Phoenix claimed a share of the sale's proceeds corresponding to its lost royalty expectation. It made similar claims as to Gulf's 37.5% sale to CEPE in 1976.
 
 
 23
 Phoenix asserted its claims under theories of unjust enrichment, breach of contract, and breach of fiduciary duty. Finding that the law of Ecuador controlled, the district court allowed the case to proceed on a theory of Ecuadorian civil law known as de in rem verso, analogous to an action for unjust enrichment. This restitution theory, the court ruled, subsumed Phoenix's quasi-contract claim. The court rejected Phoenix's claim for breach of fiduciary duty as untimely pressed.
 
 
 24
 After years of discovery and extensive pretrial proceedings that included a grant of partial summary judgment, the case reached trial in September 1986. Following a month-long bench trial, the district court prepared a thorough opinion reciting its extensive findings of fact and conclusions of law. Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 658 F.Supp. 1061 (D.Del.1987) (Phoenix IV ).
 
 
 25
 The district court ruled that Phoenix could not succeed on its unjust enrichment claim because neither the consortium in its joint 25% transfer in 1974 nor Gulf in its 37.5% sellout in 1977 had received any compensation for lost production rights or future profits. The government of Ecuador had expressly intended to pay only for the depreciated and amortized book value of the acquired assets, plus the book value of their material and supplies inventory. "It was contrary to the political philosophy of the Government of Ecuador in 1974 and in 1977 to pay for the oil reserves, which were the property of the State, the rights to exploit those reserves, or the future profits that might be earned from those reserves." Phoenix IV, 658 F.Supp. at 1078. Because Phoenix was not entitled to share in the value of the consortium's assets, the claims for unjust enrichment failed.
 
 
 26
 The court found in favor of Phoenix on its breach of contract claim that the consortium had improperly calculated the royalties due for the final quarter of 1973 and the first two quarters of 1974. The consortium had computed the two-percent royalty during those quarters on the basis of the price of West Texas sour crude oil as adjusted for transportation costs. This calculation proved especially advantageous for the consortium because, although the world price of oil rose dramatically during this period, federally-imposed controls capped the cost of West Texas crude at a rate far below world market levels.
 
 
 27
 The court concluded that the consortium's application of the West Texas price breached the parties' 1965 contract. Because the higher Ecuadorian government reference price was the proper basis for calculating the two-percent royalty, Phoenix had been underpaid by $365,479. To that sum, the court added prejudgment interest of $532,608.71--computed in accordance with the escalating Ecuadorian rates--for a total judgment of $898,087.71. Phoenix's claim for consequential damages, consisting mainly of attorney's fees, was denied because it had not been included in the pretrial order. This appeal followed.
 
 
 28
 Phoenix contends here that the district court erred in equating the amounts CEPE paid to the consortium with the interests actually transferred. In Phoenix's view, the consideration defendants received included reimbursement for future petroleum production rights. Because Phoenix's royalty arrangement entitled it to a share of the future Coca Concession production proceeds, it claims a right to a portion of CEPE's payments. Phoenix also challenges the district court's decision to foreclose its quasi-contract and breach of fiduciary duty causes of action.
 
 
 29
 Additionally, Phoenix asserts that the district court erroneously computed the underpaid 1973-74 royalties by excluding CEPE's 25% interest from the royalty volume base. Phoenix argues that its overdue royalty should be computed on the basis of the entire Coca Concession, with CEPE's 25% share included. Finally, Phoenix appeals the district court's refusal to consider its claim for consequential damages.
 
 
 30
 Phoenix insists, as well, that in exonerating Gulf Oil Company and Texaco, Inc., the district court erred because it failed to consider that the parent corporations of the Ecuadorian subsidiaries were actively involved in negotiating the breached 1965 contract and subsequent transactions. Phoenix seeks to hold the parents liable for their subsidiaries' actions.
 
 
 31
 Defendants cross-appeal. They maintain that the district court incorrectly read Ecuador's Resolutions as assigning the government's tax reference price--rather than the federally-capped West Texas crude price--to the two-percent royalty calculation. As a consequence, they argue that the court improperly ruled in Phoenix's favor on the breach of contract claim. Defendants also assert that the district court erred in its interpretation of Ecuadorian law on prejudgment interest.
 
 II. PHOENIX'S APPEAL
 A. Unjust Enrichment Claim
 
 32
 In 1983 and 1984 pretrial rulings, the district court determined that the law of Ecuador would govern Phoenix's unjust enrichment claim and that, under Ecuadorian law, the claim would proceed as an action de in rem verso. The parties have not challenged either determination. An action de in rem verso consists of five elements: (1) enrichment of the defendants; (2) loss to the plaintiff; (3) lack of justification for the enrichment; (4) no other legally available remedy; and (5) absence of a law barring the action. Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., No. 76-421, slip op. at 10-11 (D. Del. July 20, 1984) (unpublished) (Phoenix III ) (quoting 4 Alesandri & Somarriva, Curso de Derecho Civil p 1233 (1942), as translated by R. Medina, Chief, Hispanic Law Div., Law Library, Library of Congress).
 
 
 33
 To succeed on this cause of action, a plaintiff must thus prove that the defendant experienced an enrichment, and that this enrichment is unjust or illegitimate. Moreover, the defendant's increase must correspond to the plaintiff's becoming poorer: a causal relationship must exist between the defendant's enrichment and the plaintiff's loss. Id.
 
 
 34
 Phoenix did not advance funds for the purchase of any equipment used in the oil production; nor did it invest in inventory or other necessary materials or supplies. Phoenix's interest, therefore, was confined simply to a two-percent share of actual petroleum production. Unquestionably, Phoenix lost some of its future royalty interests when the consortium transferred a portion of their Coca Concession exploitation rights to CEPE. That fact, however, does not establish the defendants' enrichment at Phoenix's expense.
 
 
 35
 Phoenix does not dispute that the value the independent auditors assigned for the 1974 and 1977 transfers included no specific allowance for future production rights, nor was any value assigned to them. Phoenix argues that both conveyances used the word "rights" to describe the subject of the contracts and, therefore, more than mere physical assets were intended to be transferred. Phoenix maintains that CEPE purchased both physical assets and future production rights in 1974 and 1977, using the net book value figure merely as the measure of the purchase price. The district court carefully considered this argument, but rejected it as unpersuasive.
 
 
 36
 The fact that CEPE's acquisition prices corresponded exactly to the investments' book values militated against Phoenix's assertion. In addition, testimony given by the former Ecuadorian Natural Resources Minister and his legal advisor belie Phoenix's conclusion. These officials restated the Ecuadorian government's consistent position that the petroleum reserves belonged to the State. In their view, Ecuador "did not have to pay for something that was its own property." Phoenix IV, 658 F.Supp. at 1071. "It was an act of full sovereignty so that it did not pay one single cent and it had no reason to do so." Id. This testimony, considered along with the course of the government's dealings with the Texaco-Gulf consortium in the early 1970s and the State decree declaring all petroleum reserves the patrimony of the nation, is compelling evidence that Ecuador had no intention of compensating the consortium for their lost production rights.
 
 
 37
 Phoenix points to large profits the consortium realized over the years from its Coca Concession venture as a justification for an equitable redistribution of the proceeds from the 1974 and 1977 sales. This argument blurs the proper legal focus. The defendants' net gains are irrelevant in an unjust enrichment analysis. "Profits, no matter how large, do not constitute unjust enrichment unless they equitably belong to another person." Harris v. Sentry Title Co., 715 F.2d 941, 950 (5th Cir.1983), cert. denied, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). The terms of its 1965 contract entitle Phoenix to a two-percent royalty of net petroleum production--not a share in the profits.
 
 
 38
 Finally, Phoenix cites paragraph 2.13 of the 1977 conveyance, which provided: "With respect to the obligations that Gulf may have in favor of third parties and that do not appear in its accounting records, neither the Ecuadorian State nor CEPE assume any responsibility and must be taken care of by Gulf." This provision adds nothing to Phoenix's claim for recovery under de in rem verso.
 
 
 39
 Phoenix errs when it looks to the 1961 Minas Concession Agreement to determine the extent of petroleum rights Ecuador had conveyed. Even if under that Agreement the concessionaires had certain exploitation "rights", the Ecuadorian government later transformed those "rights" into a fully revokable "license" or "permit" which involved no title to the land or minerals whatsoever. By an exercise of sovereign fiat, the government--whether because of the large oil discoveries in 1971 or the accession to power of a military government in 1972--simply changed the legal dimensions of the interests under the 1961 Concession. All parties, Phoenix as well as the oil companies, lost as a consequence of this transformation.
 
 
 40
 The record contains support for the district court's factual findings, and Phoenix has failed to satisfy us that they were clearly erroneous. To the extent that the conclusions of the district court embody questions of law, we find no reversible error. Consequently, the judgment against Phoenix with respect to unjust enrichment must be affirmed.
 
 B. Quasi-Contract and Fiduciary Duty Claims
 
 41
 Phoenix objects to the pretrial dismissal of its quasi-contract and breach of fiduciary duty claims. Neither of these claims had been fully briefed or vigorously pursued below. Phoenix never specified the elements of the claims under Ecuadorian law, nor did it explain how its allegations conformed to those elements. As the party seeking to recover under a foreign nation's cause of action, Phoenix bore the burden of proving its entitlement to that relief. Cuba R.R. v. Crosby, 222 U.S. 473, 479, 32 S.Ct. 132, 133, 56 L.Ed. 274 (1912).
 
 
 42
 For ten years, the district court wrestled with this case, battling a seemingly never-ending barrage of paper. In Phoenix II, the court characterized the pretrial condition of the case as a "hopelessly confused morass." Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 560 F.Supp. 1372, 1390 (D. Del. 1983) (Phoenix II ). By that time, seven years after the suit was filed, the court justifiably could expect Phoenix to have clarified its position and finally have settled on its legal theory. The court struggled toward narrowing the issues for trial and deserved the litigants' cooperation.
 
 
 43
 In the 1983 pretrial "wrap-up" the court ruled that the three-year statute of limitations barred recovery for all tortious acts occurring before November 26, 1973. At that stage in the litigation, Phoenix was alleging that the defendants had tortiously engaged in a continuing scheme to destroy it. However, most of the alleged activity occurred outside the statute of limitations, and was thus time-barred. As to the remaining allegations, the court determined that the facts charged as tortious sounded in contract rather than tort.
 
 
 44
 At a pretrial conference following the 1983 ruling, the parties presented the court with a 184-page proposed pretrial order, which the court declined to accept. The parties subsequently filed additional briefing on Ecuadorian law and further argument followed. Most efforts during this period were devoted to exploring Ecuadorian law on unjust enrichment. As the court noted, only two issues not previously decided were raised: "the parameters of an unjust enrichment theory in Ecuador and that relating to a contract dispute over the three quarters of royalty payments." Phoenix III, slip op. at 5.
 
 
 45
 In deciding how to proceed on Phoenix's unjust enrichment claim, the court reviewed the three principal quasi-contract theories enumerated in the Ecuadorian Civil Code: the "unsolicited agency, the payment of something not owed, and the community." Phoenix III, slip op. at 9 (citing Civil Code art. 2212 (Ecuador)). The court stated that ambiguities in those provisions of the Code "might well lead to a statutory basis behind plaintiff's claim." Nevertheless, the court concluded that Phoenix's inability to fit its allegations squarely into one of these three civil code sections would not preclude a recovery under a "general theory of unjust enrichment." Id.
 
 
 46
 After further study, the court announced that Phoenix could proceed to trial on the unjust enrichment de in rem verso theory. The court observed also that Phoenix might have "a few lingering contract claims of minor pecuniary significance relating to the three quarters of 1973 and 1974. If plaintiff so desires, those claims, too, will proceed to trial." The court then directed the parties to submit a "manageable" proposed pretrial order. Phoenix III, slip op. at 18.
 
 
 47
 Phoenix later attempted to resurrect its defunct tort cause of action, this time as a claim for breach of fiduciary duty. The court permitted this count--added seven years after the original complaint was filed--to be briefed, and argued during the final pretrial conference on February 18, 1986. After consideration, the district judge directed that the trial proceed only as to the two theories outlined in the 1983 order: unjust enrichment and breach of contract. As to the belated breach of fiduciary duty claim, the judge stated: "It would appear to me that the plaintiff is saying we acknowledge the validity of the decrees of the Ecuadorian government but the plaintiffs are entitled to go through the back door to attack the defendants for permitting the decrees to have been made."
 
 
 48
 After our examination of the lengthy history of this case, we think it appropriate to commend the district judges for their tireless efforts to narrow the issues to manageable proportions. Having carefully monitored the pretrial developments for nearly a decade, the district court's preclusion of an issue raised at the "twenty-third hour", it seems to us, was within the court's proper discretion. In any event, though not determinative, our review leads us to conclude that Phoenix had little likelihood of success on either its quasi-contract or breach of fiduciary duty theory.
 
 
 49
 In Phoenix II, Judge Schwartz observed that the "concept of unjust enrichment--basically an equitable premise--structurally forms the basis for theories of quasi contract." Phoenix II, 560 F.Supp. at 1384. See Kovacic, A Proposal to Simplify Quantum Meruit Litigation, 35 Am. U.L.Rev. 547, 554 (1986). Phoenix's own legal expert, Rene Bustamente Munoz, has explained that the same is true under the law of Ecuador: "We also consider that unjust enrichment or enrichment without cause is the foundation of all the quasi contracts mentioned by Arts. 1480, 2211 and 2212 of the Civil Code as one of the sources of obligations." (App. 804) As a result, our determination that the district court correctly rejected Phoenix's unjust enrichment claim similarly dooms its claims under quasi-contract.
 
 
 50
 There is no reversible error here.
 
 C. Volume Base Claim
 
 51
 In its 1983 pretrial ruling, the district court granted summary judgment against Phoenix on its claim that the consortium improperly had excluded CEPE's 25% interest when computing the two-percent royalty payments. Yielding to the model contracts the government had decreed for all oil companies in 1973, the consortium reluctantly transferred 25% of its interest in the Coca Concession to CEPE. Following this transfer, the consortium reduced by CEPE's 25% the volume base on which it calculated Phoenix and Norsul's two-percent royalty. In the district court, Phoenix contended that this reduction constituted a breach of its 1965 contract.
 
 
 52
 The district court decided that the Ecuadorian government had addressed directly the amount of oil production which legally could be subjected to the two-percent royalty. Resolution 11927 provided that "there shall be excluded, in order to carry out the assessment of the 2%[,] the percentage of CEPE in the net production." The court accorded this decree and its affirming Sentencia presumptive validity which Phoenix failed to overcome. The court rejected Phoenix's argument that the Resolution could not adjudicate private rights and that it was intended only to apply to the calculation of the government's 86% royalty tax.
 
 
 53
 Two years later, Phoenix sought reconsideration based on additional documents and the depositions of former Ecuadorian ministers. Phoenix argued that Ministry calculation sheets for 1975 revealed that the government had computed the two-percent royalty on the full 100% volume base and only then taxed at the 86% rate 75% of the volume base. After the depositions were taken and following argument by the parties, the district court denied the motion to reconsider. The court found the newly submitted calculation sheets unenlightening and concluded that the particular mathematics the government used did not change the legal basis on which summary judgment had been entered. Nor did the new evidence create any issue of material fact.
 
 
 54
 We find no reversible error in the district court's initial entry of summary judgment or its subsequent refusal to alter the ruling in light of the new evidence. Resolution 11927's "whereas" clauses stated expressly that the decree was designed "to terminate the disagreements arising out of the assessment and payment of two percent of the net production established in Clause Sixth of the private agreement signed on July 16, 1965," and also to "establish with certainty the taxable base which generates the income tax."
 
 
 55
 The taxation-only interpretation Phoenix encourages us to give Resolution 11927 ignores the government's purpose, stated in the document's first whereas clause, to resolve the disagreements between the parties. Certainly, this goal would not be accomplished if the Resolution's provisions did not apply to the untaxed, distributed portion of the royalty--that part actually in dispute among the parties. Moreover, the Resolution contains numerous provisions that clearly apply to the entire two-percent royalty, rather than to just the taxed portion.
 
 
 56
 Read as Phoenix would advocate, the Resolution would require royalty payments on the entire 100% volume base yet only 75% of the royalty payments would be subject to the government's 86% royalty tax. The government, in effect, would be foregoing its 86% tax on a quarter of all royalties paid. The obvious hostility with which the government viewed these royalty payments suggests strongly that it would not have enacted such a provision.
 
 
 57
 The deposition evidence supports the district court's entry of summary judgment on this claim. The Natural Resources Minister testified that neither CEPE nor any third party was obligated to pay the two-percent royalty on oil that belongs to the State. The Minister's legal advisor was even more specific, stating that under Resolution 11927 the consortium had the duty to pay the two-percent royalties only after deducting from the production amounts that portion belonging to CEPE.
 
 D. Consequential Damages
 
 58
 At the conclusion of the month-long bench trial, Phoenix submitted its Proposed Findings of Fact and Conclusions of Law. Included in the submission was a request for consequential damages (attorney's fees), though such a claim did not appear in the pretrial order. The district court rejected this damage claim as belatedly raised. "This claim was not included in the Pre-Trial Order and we will not permit it to be raised now in this untimely manner." Phoenix IV, 658 F.Supp. at 1082.
 
 
 59
 The pretrial procedures adopted for the federal courts were formulated with the express goal of facilitating scheduling and case management. Fed.R.Civ.P. 16(a) advisory committee's note. Particularly important in complex civil cases such as this, pretrial procedures provide the district courts with a useful tool to harness unwieldy litigation by simplifying the dispute and narrowing the issues for trial. For this reason, pretrial orders bind the parties unless modified by the court to prevent manifest injustice. Fed.R.Civ.P. 16(e). After a decade managing this enormous dispute, the district court acted within its discretion to reject a claim for consequential damages asserted after trial but not in the pretrial order. See Trujillo v. Uniroyal Corp., 608 F.2d 815, 817 (10th Cir.1979); Moore v. Sylvania Elec. Prods., Inc., 454 F.2d 81, 84 (3d Cir.1972).
 
 E. Parental Liability
 
 60
 The district court entered judgment in favor of Phoenix on its breach of contract claim for undercalculated royalties for the final quarter of 1973 and the first two quarters of 1974. Phoenix also had sought to extend that liability to the parent corporations, Texaco, Inc. and Gulf Oil Corporation. The district court denied this request.
 
 
 61
 Proceeding only on the basis of an agency theory of parental liability, the district court ruled that the parent corporations would not be liable for the actions of their subsidiaries. The court found that the parents and the subsidiaries here shared several common officers and directors, though their boards otherwise were separate. The parents also participated in the substantial financial dealings of the subsidiaries, who were required to secure approval from their parent corporations for large investments and acquisitions or disposals of major assets.
 
 
 62
 On the other hand, the subsidiaries kept separate books and records, maintained their own bank accounts, paid their own taxes, and were responsible for their own day-to-day operations in Ecuador, including drilling oil wells and constructing the pipeline. Relying on Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc., 456 F.Supp. 831 (D.Del.1978), the district court concluded that "it can hardly be said that the facts presented to the court in this case show complete domination or control by Texaco and Gulf over their subsidiaries." Phoenix IV, 658 F.Supp. at 1085.
 
 
 63
 The relationship between parent and subsidiary corporations has been a fruitful source of litigation and although the case law on the subject is extensive, it is neither uniform nor clear. Some decisions apply an agency theory to assess parental liability, others focus on an alter ego basis, and some speak in terms of "piercing the corporate veil." Much of the confusion stems from a failure to distinguish between subsidiaries treated as independent entities and those in fact not independent, but considered part of the parent corporations.
 
 
 64
 Courts most often "pierce the corporate veil" where fraud would result if the corporate structure were allowed to shield shareholders from liability. Thus, in DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 685-87 (4th Cir.1976), the court noted that independent corporate status may be disregarded when such factors as gross undercapitalization, fraud, failure to observe corporate formalities, non-functioning of officers and directors, or similar circumstances indicate that the subsidiary is merely the shadow of the parent. If, as in this case, the shareholder happens to be another corporation, piercing the corporate veil results in disregard for the separate existence of parent and subsidiary.
 
 
 65
 In determining whether two corporations are truly separate, significant factors to consider include adequacy of capitalization, overlapping directorates and officers, separate record keeping, payment of taxes and filing of consolidated returns, maintenance of separate bank accounts, level of parental financing and control over the subsidiary, and subsidiary authority over day-to-day operations. See 1 Fletcher, Cyclopedia of the Law of Private Corporations Sec. 43, at 194 (cum. supp. 1987). In that context, the concept of complete domination by the parent is decisive. See Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145 (3d Cir.1988). The activities bearing on the issue of corporate independence need not have any particular relationship to the cause of action being asserted.
 
 
 66
 There is a second theory under which a parent may be held liable for the activities of its subsidiary: an application of general agency principles. One corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company. However, one corporation--completely independent of a second corporation--may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. See Restatement (Second) of Agency Sec. 14M, comment (a) (1958). Under this second theory, total domination or general alter ego criteria need not be proven.
 
 
 67
 When one corporation acts as the agent of a disclosed principal corporation, the latter corporation may be liable on contracts made by the agent. See Restatement (Second) of Agency Sec. 144 (1958). Liability may attach to the principal corporation even though it is not a party named in the agreement. See Restatement (Second) of Agency Secs. 147, 149 (1958).[4] See also W. Seavey, Handbook of the Law of Agency Sec. 70 (1964); W.E. Sell, Agency Sec. 103 (1975).
 
 
 68
 Unlike the alter ego/piercing the corporate veil theory, when customary agency is alleged the proponent must demonstrate a relationship between the corporations and the cause of action. Not only must an arrangement exist between the two corporations so that one acts on behalf of the other and within usual agency principles, but the arrangement must be relevant to the plaintiff's claim of wrongdoing.[5]
 
 
 69
 In reaching its decision to exonerate the parents, the district court relied heavily on Japan Petroleum. In that case, despite extensive interaction between parent and subsidiary, the court found them to be separate and, thus, held the parent not liable for the acts of its subsidiary. Apparently, the fact that the Nigerian subsidiary had powers granted by the Nigerian government that were unavailable to the parent was the decisive factor in finding the parent not liable. Cf. Fitz-Patrick v. Commonwealth Oil Co., 285 F.2d 726 (5th Cir.1960) (incorporation of foreign subsidiary to meet governmental requirement did not insulate parent from liability).
 
 
 70
 The 1978 holding in Japan Petroleum was not appealed to this court, and consequently we have not been called upon to examine the correctness of its analysis. Nor do we embark on a review of that case at this time. We are content with noting that the facts here are sufficiently distinguishable so that the same result would not necessarily follow. Nevertheless, because the issue is one of fact, see 1 Fletcher, supra, at Sec. 43, at 472 (rev. perm. ed. 1983), we cannot say that the district court's finding of no complete domination here is clearly erroneous.
 
 
 71
 However, the district court did not analyze customary agency principles as another possible source of parental liability. When using that approach, the completeness of the subsidiary's domination by a parent is not material--the focus instead centers on whether the Ecuadorian corporations, though separate and independent from the United States corporations, acted as agents for disclosed principals.
 
 
 72
 In conducting this review, the focus must be directed to the pertinent cause of action. Thus, only the judgment in favor of Phoenix on the undercalculation of royalties due for the three quarters in 1973 and 1974 is relevant. The evidence of relationship between the parents and subsidiaries as it bears on that breach of contract is the proper subject of our inquiry.
 
 
 73
 We can appreciate the difficulty which the district court confronted as a result of the parties' failure to carefully identify the affiliations of many of the actors. For example, in numerous instances individuals identified with Texaco or Gulf are not specifically classified as employees of the Ecuadorian subsidiaries, of the United States' parents, or perhaps employed by one and acting on behalf of the other. Similarly, correspondence which could prove important in assessing attribution of activity to parent or subsidiary is not definitive.
 
 
 74
 With these uncertainties in mind, we observe with some diffidence that several significant events may bear on the creation of, or absence of, an agency relationship between the subsidiaries and the parents in connection with the 1965 contract.
 
 
 75
 It appears that the parents negotiated and drafted the 1965 agreement, but it was actually executed by Compania Texaco de Petroleos del Ecuador C.A. and Gulf Ecuatorana de Petroleos S.A. In 1969 when oil was discovered, the parents issued a joint press release announcing that they each owned a fifty percent working interest in the discovered reserves, subject to a two-percent royalty. The release said: "Texaco and Gulf obtained the Coca concession by assignment from Minas y Petroleos Del Ecuador ...."
 
 
 76
 When the royalty agreement underwent renegotiation in 1972, employees of the parent corporations apparently assumed a controlling role in the process. It was the parents who recommended the use of West Texas crude as the reference price for calculating the two-percent royalties.
 
 
 77
 CEPE made its 1977 buyout payment for the Gulf interest to the parent, Gulf Oil Corporation, at the parent's home bank in Pittsburgh. Although that event occurred several years after the three quarters breach of contract, it nevertheless may shed some light on the nature and extent of the control exercised by the parent as principal in earlier years. See Verreries De L'Hermitage v. Hickory Furniture Co., 704 F.2d 140, 142 (4th Cir.1983).
 
 
 78
 Because the district court did not explore customary agency principles as a possible source of parental liability, we will remand for further inquiry and fact-finding to determine the applicability of those principles to the case at hand. We note that, under usual agency principles, complete domination by the parents in the general conduct of the subsidiaries' affairs is not a prerequisite. The parents and subsidiaries may fully maintain their separate corporate existences; yet, as any two unrelated companies, they might have entered into a limited agency relationship for a specific transaction. Whether this occurred here is a question of fact reserved to the district court.
 
 III. TEXACO AND GULF CROSS-APPEAL
 A. Breach of Contract
 
 79
 At trial, Phoenix was awarded $365,479 for its breach of contract claim for undercalculated royalties. The court ruled that, in computing the two-percent royalty, the consortium had improperly adopted the federally-capped West Texas crude price instead of the higher Ecuadorian government's tax reference price. Defendants cross-appealed from this ruling, contending that their calculations comported with the terms of the 1965 contract.
 
 
 80
 The two-percent royalty arrangement was set out in paragraph 6 of the 1965 contract. The provision states that, for all purposes of the contract, the value of the crude oil "shall be understood as the value defined in each case for the purpose of calculating the payment of the royalties which cessionaires must make to the Government." Paragraph 8, on which defendants rely, provides that the price calculations were to be made on the "same bases established for the respective payments to the Government, according to [the 1961 Minas Agreement]."
 
 
 81
 The 1961 Minas Agreement established a formula for calculating the royalty owed the government based on "the average volume of the oil in the world market." To compute this average value, the Agreement created the equation X = A - B, in which "X" represented the world market value, "A" represented the West Texas crude price, and "B" represented the cost of transporting the crude from Ecuador to New York.
 
 
 82
 However, the 1971 national Hydrocarbons Law explicitly superceded all existing contractual provisions on the calculation of government royalties. Article 65 of the Hydrocarbons Law stated: "Royalties in cash, income tax, government's participation and generally any assessments depending on the sale price of hydrocarbons in the foreign market, shall be regulated by the reference prices of petroleum." The government unilaterally set this "reference price."
 
 
 83
 The passage of this new law revealed a previously undetected conflict between paragraphs 6 and 8 of the 1965 contract. Paragraph 6 tied Phoenix's royalty to the value of the government royalty, a figure the 1971 Law had legislatively increased. Paragraph 8 appeared to link the Phoenix royalty to the value of the government royalty as it would have been calculated under the 1961 Minas Agreement--the lower West Texas price.
 
 
 84
 In resolving this apparent conflict, the district court ruled that the Hydrocarbons Law had supplanted the terms of the 1961 Agreement to which paragraph 8 referred. "Once the 1971 Law was promulgated, calculation of government royalties under the 1961 Concession Contract was based no longer on ... the 1961 Contract, but on ... the 1971 Law." Phoenix IV, 658 F.Supp. at 1080. Thus, because the two-percent royalty was dependent on the amount "which cessionaires must make to the Government," the Hydrocarbons Law altered not only the calculation of the government royalty, but the calculation of Phoenix's royalty as well.
 
 
 85
 If the ambiguity of the two-percent royalty provisions of the 1965 contract has led to a result defendants had not anticipated, the fault is their own. As authors of the contract, they could have made their terms plain; their failure to do so cannot inure to their benefit. See John F. Harkins Co. v. Waldinger Corp., 796 F.2d 657, 662 n. 2 (3d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987). We agree with the district court that the contract's reference to the amount paid in government royalties necessarily established a benchmark which could be altered by the State through force of law.
 
 
 86
 We have examined in detail the defendants' other contentions and we are not persuaded. We accept the view of the district court.
 
 B. Segmented Prejudgment Interest
 
 87
 On the $365,479 breach of contract judgment, the district court awarded $532,608.71 in prejudgment interest. Defendants challenge the court's calculation of this sum.
 
 
 88
 The 1965 contract contained no prescribed rate of interest, and the parties agree that Ecuador's legal rate of interest would be applicable. Defendants contend that awards of prejudgment interest under Ecuadorian law accrue from the date of service of process. The district court accepted this starting date and then sought to apply the appropriate rate, a task complicated by the precipitous rise in interest rates that occurred during the pendency of this litigation.
 
 
 89
 At the time the complaint was served, the legal rate of interest in Ecuador was 8%. The rate rose dramatically in five stages to 23%, the rate in effect in 1984. Modifications to the interest rates were accomplished by resolutions issued by the Ecuadorian Monetary Board. The resolutions encompassed a wide range of transactions and set varying rates for each, including such diverse items as interest payable on savings passbooks, mortgage bonds, development bonds, obligations of the central and provincial governments, interbank transactions, and various credit operations.
 
 
 90
 Article 8 of a typical resolution read: "The provisions of the present Regulation shall apply only to the acts and contracts entered into from and including the date it is published in the Registro Official. Therefore, the types of interest rates stipulated in the acts and contracts entered into prior to that date, be they drawn or to be drawn, shall continue in effect until the expiration date agreed upon in the respective act or contract."
 
 
 91
 The resolutions applied to many different types of transactions and not merely to causes of action in court. The resolutions' language must be read against their background of broad application.
 
 
 92
 In 1975, the Monetary Board issued Resolution 755 which fixed the legal interest rate at 8%. Defendants aver that this rate should apply to the entire breach of contract judgment. The district court disagreed and applied a segmented interest rate reflecting the five successive increases in the Ecuadorian legal rate.
 
 
 93
 The court acknowledged the Resolution's statement that the new rates were to apply only to agreements entered into after the date of the Resolution's publication, but held the restriction was limited to contracts providing a stipulated rate of interest. Because the contract here contained no such stipulation, the prejudgment interest rate was increased as the legal rate rose.
 
 
 94
 In so ruling, the court accepted the views of Phoenix's expert and rejected those of the defendants' experts. The court also declined to follow a decision of the Supreme Court of Ecuador, Segovia v. Acosta, Judgment No. 341, Third Chamber, November 11, 1977, which presented a similar factual situation. The district court observed correctly the lack of precedential effect of judicial decisions in civil law jurisdictions.
 
 
 95
 We find no reversible error in the district court's ruling on prejudgment interest. The court properly reasoned that if the arrearages had been paid promptly, Phoenix could have taken advantage of the rising legal rates of interest in Ecuador. Pursuant to Resolution 11927, Phoenix was compelled to invest half of its after-tax royalty proceeds in Ecuador and, thus, would surely have profited from the soaring legal rates. "Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." West Virginia v. United States, --- U.S. ----, ----, 107 S.Ct. 702, 706 n. 2, 93 L.Ed.2d 639 (1987).
 
 IV. SUMMARY
 
 96
 We will affirm the judgment in favor of Phoenix for breach of contract arising out of payments due for the last quarter of 1973 and the first two quarters of 1974. On that claim, we will vacate the judgment in favor of the parent Gulf Oil Corporation (now, by change of name, Chevron U.S.A., Inc.) and remand for further proceedings consistent with this opinion. We will affirm the district court's award and calculation of prejudgment interest. Because of the automatic stay under the Bankruptcy Code, we will not enter any dispositive order as to Texaco, Inc. at this time. We will affirm all the remaining judgments in favor of defendants.
 
 
 
 [1]
 Minas apparently failed to meet the government's investment requirements for the remaining portion of its 1961 Concession area. In February 1973, the Ecuadorian government declared the non-transferred portion of the Minas Concession forfeited to the State
 
 
 [2]
 Shortly after the Ecuadorian government granted the Minas Concession, Norsul Oil and Mining Ltd., a small Canadian corporation, acquired Minas y Petroleos del Ecuador. Two years later, at Norsul's invitation, Phoenix joined in the Ecuador operation as a co-venturer. Norsul is not a party to this appeal
 
 
 [3]
 At the time of its withdrawal from Ecuador, Gulf's share in the original Minas Concession had been reduced to 37.5%. Under the terms of the 1965 contract with Phoenix and Norsul, Gulf and Texaco had each acquired a 50% interest in the Coca Concession. In 1974, CEPE's 25% participation had reduced the consortium's share to 75% and, thus, each consortium member's share had been reduced to 37.5%. Following Gulf's withdrawal, CEPE retained a 62.5% interest in the Coca Concession and Texaco retained a 37.5% interest
 
 
 [4]
 Although the agency question could perhaps have been determined under the law of Ecuador, the parties acquiesced in the district court's application of Delaware Law. Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 658 F.Supp. 1061, 1084 n. 43 (D.Del.1987) (Phoenix IV ). We see no reason why we should disturb the parties' choice of law in these circumstances. Delaware agency law is consistent with the general common law. See Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc., 456 F.Supp. 831, 838-41 (D.Del.1978) (applying Restatement)
 
 
 [5]
 This limitation was acknowledged in Fisser v. International Bank, 282 F.2d 231, 238 (2d Cir.1960), where the court quoted with approval one commentator's view: "Restating the instrumentality rule, we may say that in any case, except express agency, ... three elements must be proved: (1) Control ... not only of finances, but of policy and business practice in respect to the transaction attacked...."