**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2631
_____

COMPAGNIE DES GRANDS HÔTELS D'AFRIQUE S.A.,
Appellant

v.

STARWOOD CAPITAL GROUP GLOBAL I LLC;
STARMAN HOTEL HOLDINGS LLC
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-18-cv-00654)
District Judge: Hon. Stephanos Bibas[*]
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on June 24, 2024

Before: KRAUSE, RESTREPO, and MATEY, *Circuit Judges*.

(Filed: September 20, 2024)
_____

OPINION[**]
_____

_____

[*] Judge, Third Circuit Court of Appeals, Sitting by Designation
[**] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

KRAUSE, *Circuit Judge*.

Appellant Compagnie des Grands Hôtels d'Afrique ("Compagnie") owns the Royal Mansour Hotel (the "Hotel") in Casablanca, Morocco. In 1989, Compagnie entered into a Management Agreement with Woodman Maroc S.à.r.l. ("Woodman"), which was acquired in the mid-2000s by Appellees Starwood Capital Group Global I LLC ("Starwood") and Starman Hotel Holdings LLC ("Starman").[1] The hotel's condition declined for years, and in 2012, Woodman missed a rent payment to Compagnie, violating the Management Agreement. Compagnie began an arbitration proceeding against Woodman in London that ultimately led to an award against Woodman of tens of millions of dollars in damages, none of which it paid. Compagnie eventually filed the underlying suit here, alleging liability under the theories that (1) Woodman acted as Appellees' agent and (2) Woodman was merely an alter ego for Appellee Starman, meriting piercing of the corporate veil, but the District Court dismissed the first claim and granted summary judgment against Compagnie on the second.

We will reverse and remand. As to agency liability, the District Court did not apply the correct rule of Delaware law. As to alter-ego liability, while we agree with the District Court that two of Compagnie's alter-ego arguments lack merit, its third, concerning fund siphoning, presents a genuine dispute of material fact. We address those claims in turn.

---

[1] Woodman only took that name after its acquisition by Appellees. Previously, it was known as Trusthouse Forte Morocco S.à.r.l. and, later, Meridien Maroc S.à.r.l.

## DISCUSSION[2]

### I.  Compagnie's Agency Claim

First, Compagnie argues that in breaching the Management Agreement, Woodman acted as Appellees' agent, and that they can therefore be held liable for Woodman's breach.

Generally, the only parties liable for breach of a contract are the parties who signed it.  *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999).  But "[w]hen one corporation acts as the agent of a disclosed principal corporation, the latter corporation may be liable on contracts made by the agent."  *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988) (citing Restatement (Second) of Agency §§ 144, 147, 149 (Am. L. Inst. 1958)).  Unlike alter-ego theories of corporate liability, agency "does not overlook the distinctions between the entities involved, but instead creates a narrow path to liability focused on the principal's authority and control over the agent's wrongdoing."  *Otto Candies, LLC v. KPMG, LLP*, No. 2018-0435, 2020 WL 4917596, at *9 (Del. Ch. Aug. 21, 2020).

Here, the District Court dismissed Compagnie's agency claims on the grounds that agency liability "applies only if the parent existed at the time the subsidiary signed the

---

[2]  The District Court had jurisdiction under 28 U.S.C. §§ 1331–32 and 9 U.S.C. § 203.  We have jurisdiction under 28 U.S.C. § 1291.  We review a district court's grant of a motion to dismiss de novo, accepting as true all factual allegations in the complaint and viewing those facts in the light most favorable to the nonmovant.  *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021).  We exercise plenary review over grants of summary judgment and view the evidence in the light most favorable to the nonmovant.  *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010).

contract: A parent company can be held liable only for 'conduct shown to be instigated by' it." *Compagnie des Grands Hôtels d'Afrique S.A. v. Starman Hotel Holdings LLC*, No. 1:18-cv-00654, 2021 WL 4893366, at \*2 (D. Del. Oct. 20, 2021) (quoting *C.R. Bard Inc. v. Guidant Corp.*, 997 F. Supp. 556, 560 (D. Del. 1998)). Applying this purported rule, the District Court reasoned that because Appellees did not exist at the time of the Management Agreement's execution, they could not be held liable for their subsidiary's breach.

We disagree with that statement of Delaware law. A corporate parent need not have been extant at the time a contract was formed to be liable for its subsidiary's breach of that contract under an agency theory. Instead, Delaware law requires a plaintiff alleging agency liability to "demonstrate a relationship between the corporations and the cause of action." *Phoenix Canada Oil*, 842 F.3d at 1477. Specifically, the plaintiff must "plead [the parent's] control over that specific wrongful act." *Otto Candies*, 2020 WL 4917596, at \*12; *see also Phoenix Canada Oil*, 842 F.2d at 1477 ("[O]ne corporation . . . may assume the role of the second corporation's agent in the course of one or more specific transactions."). When the cause of action is a breach of contract, the relevant inquiry is not whether the corporate parent existed when the contract was *formed*, but whether it existed when the contract was *breached*.

In crafting its rule, the District Court relied on a Delaware case that disregards this simple principle. In *Mabon, Nugent & Co. v. Texas American Energy Corp.*, 1988 WL 5492 (Del. Ch. Jan. 27, 1988), a subsidiary defaulted on debentures after it had been acquired by the corporate parent, but the Court of Chancery disregarded that fact and held

4

that the plaintiff's agency theory of liability against the parent was "deficient" because the subsidiary was not the parent's agent "when the debentures were issued." *Id.* at \*4. Notably, the *Mabon, Nugent* court did not explain its indifference to the parent's ownership of the subsidiary at the time of default, and it misstated a core principle of agency law, asserting that "[t]o establish liability under an agency theory, plaintiffs must show that the parent dominates and controls the subsidiary." *Id.* Not so. Under an agency theory, "total domination or general alter ego criteria need not be proven." *Phoenix Canada Oil*, 842 F.2d at 1477.

At least two cases decided since *Mabon, Nugent* have suggested that an acquiring parent can be liable for its subsidiary's wrongful conduct if it occurred post-acquisition. *See In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.*, No. 1672, 2006 WL 2632328, at \*7 (E.D. Mo. Sept. 13, 2006) (holding that "if [subsidiary] continued engaging in fraudulent actions after the acquisition, agency theories could impose liability on [parent] for those later harms."); *cf. Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 272 (D. Del. 1989) (holding that parent could not be liable as a principal "direct[ing] the specific actions of the alleged agent" because it did not acquire subsidiary until five years after subsidiary began breaching patent).[3] *See also Ronald A. Katz Tech.*

---

[3] Curiously, the district court in *Mobil Oil* wrote that in reaching its conclusion, it applied "[i]dentical logic" to that used by the Court of Chancery in *Mabon, Nugent*, 718 F. Supp. at 272, but it did not, instead adopting an approach more consistent with Delaware agency law. In *Mobil Oil*, the patent-breaching conduct occurred *before* acquisition— hence, the District Court's rejection of Mobil's argument that the Defendant "directed the alleged infringement by the [subsidiary]." *Id.* By contrast, in *Mabon, Nugent* the default on the debentures occurred *after* acquisition, leaving open the possibility that the parent

*Licensing v. Verizon Commc'ns, Inc.*, No. 01-5627, 2002 WL 31356302, at *3 (E.D. Pa. Oct. 16, 2002) (citing *Mobil Oil Corp.*, 718 F. Supp. at 272) (holding that parent "may be liable . . . if it is directing the specific actions of the alleged agent."). These cases underscore that in considering a parent's agency liability for a breach, courts look not at whether the parent existed when the contract was formed, but instead at "the arrangement between the corporations, the authority given in the arrangement, and the relevance of that arrangement to the Plaintiffs' claim." *Eisenmann Corp. v. Gen. Motors Corp.*, No. 99C-07-260, 2000 WL 140781, at *12 (Del. Super. Ct. Jan. 28, 2000); *see also Phoenix Canada Oil*, 842 F.2d at 1477 (holding that agency liability requires that "an arrangement exist between the two corporations so that one acts on behalf of the other and within usual agency principles" and that "the arrangement must be relevant to the plaintiff's claim of wrongdoing").

In addition to being contrary to Delaware law, the District Court's rule, if adopted, would have a perverse practical consequence: It would grant parent companies blanket immunity from agency liability for actions their subsidiaries take pursuant to contracts formed before the parents existed. Such immunity is ill-suited to a modern capitalist

---

had directed the conduct, as required under agency principles. Even stranger, the *Mobil Oil* court stated in a footnote that it, like the *Mabon, Nugent* court, "[found] most pertinent the fact that the [parent] corporation did not even exist at the time the alleged infringement began," even though the parent in *Mabon, Nugent* did, in fact, exist when the wrongful conduct occurred. *Id.* at 272 n.16. Nonetheless, the *Mobil Oil* court was ultimately correct in focusing on whether the parent was able to direct the breach. *See id.* at 271.

economy where companies may be acquired by multiple parents across their lifetimes, including parents formed only recently.

For these reasons, we will reverse the District Court's dismissal of Appellant's agency claims. On remand, the District Court should apply the correct standard of parental-agency liability and determine whether Appellant has stated a plausible claim. *See Otto Candies*, 2020 WL 4917596, at \*9–\*12; *Phoenix Canada Oil*, 842 F.2d at 1477–78.

## II. Compagnie's Alter Ego Claim

Under Delaware law, veil piercing is an uncommon remedy reserved for "the exceptional case," *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012) where a corporation is shown to be "a sham" that "exist[s] for no other purpose than as a vehicle for fraud," *Wallace*, 752 A.2d at 1184. In substance, two companies meet this test when (1) they operate as a single economic entity, *Manichaean Capital, LLC v. Exela Techs., Inc.*, 251 A.3d 694, 707 (Del. Ch. 2021) and (2) this deceptive "corporate structure cause[d] fraud or similar injustice," *Wallace*, 752 A.2d at 1184. Delaware courts weigh "a number of factors in determining whether to disregard the corporate form and pierce the corporate veil," including whether the sham company was undercapitalized; whether it was solvent; whether corporate formalities were observed in

7

its maintenance; whether the parent company siphoned its funds; and whether it functioned as "a façade" for the parent. *Manichaean Capital*, 251 A.3d at 706. [4]

Here, although the District Court held that there was a genuine dispute of fact as to whether Starman and Woodman operated as a single economic entity, it granted summary judgment for Starman because it was not persuaded there was fraud or injustice. On appeal, Compagnie raises three arguments for why injustice was, in fact, present. We consider them in turn.

### A. Starman's "Placate and Delay" Strategy

First, Compagnie argues that Starman caused fraud and injustice through its use of what Compagnie calls a "placate and delay" strategy. Opening Br. 45–46. According to Compagnie, Starman assured Compagnie that it was committed to Woodman's financial

---

[4] Our dissenting colleague reads *Manichaean Capital*'s reference to "some combination of these factors, in addition to an overall element of injustice or unfairness," 251 A.3d at 706, to mean that the requisite element of fraud or fraud-like injustice is a standalone factor that must be established independent of the considerations identified by Delaware courts. But we do not read *Manichaean Capital* or other Delaware caselaw to erect such a firewall; rather, they teach that where the facts support it, the "fraud or similar injustice" may be inferred from the presence of these enumerated factors. *See, e.g.*, *Pauley Petroleum, Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968) (describing veil piercing as appropriate "only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation required it, are involved"); *Manichaean Capital*, 251 A.3d at 709 (holding that "[a]cts intended to leave a debtor judgment proof are sufficient to show fraud and injustice" and finding that plaintiffs had sufficiently pleaded that "fraud and injustice has resulted and will result from the diversion of funds"); *see also United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981) (holding that the presence of some of the factors "can be sufficient to show . . . unfairness"). Indeed, adopting the dissent's view would create a quandary of proof, requiring plaintiffs to prove fraud or injustice without reference to the conduct and circumstances constituting the fraud.

health and to honoring its obligations under the Management Agreement.  Compagnie says that in fact, these representations were "little more than an attempt to prevent Compagnie from pursuing legal remedies against Woodman."  Opening Br. 47.

We agree with the District Court that this strategy does not meet the high bar of fraud or injustice.  Compagnie does not show how Starman's purported strategy in fact prevented it from filing suit for breach of contract or for repossession of the hotel.  Though it may be true, as Compagnie argues, that it "does not bear the burden of proving the unavailability of every other possible legal remedy," Opening Br. 52, it does bear the burden of proving fraud or injustice, and the only fraud or injustice it alleges because of the placate and delay strategy is its decision to forego litigation.  But that decision was Compagnie's alone; nothing about Starman's conduct in fact disarmed its ability to sue.  This argument must fail.

### B.  Starman's Sale of Woodman

Second, Compagnie points out that actions designed to make a corporation judgment-proof can be "sufficient to show fraud and injustice," *Manichaean Capital*, 251 A.3d at 708-09 (citation omitted), and asserts that Starman's sale of Woodman (and its direct corporate parent) in 2014 was a sham designed to shield both Starman and Woodman's managers from liability.  The District Court rejected this argument on the ground that Compagnie failed to show how the sale rendered Starman and Woodman's managers immune from liability.

We agree.  Starman was not liable for Woodman's breach before the sale simply by virtue of being Woodman's parent, *see Anderson v. Abbott*, 321 U.S. 349, 362 (1944)

9

("Limited liability is the rule not the exception . . . ."), and Compagnie does not explain how the sale changed this basic fact. Instead, it baldly asserts that the sale made Starman judgment-proof and is evidence of Starman's managers' "knowledge of their improper conduct." Reply Br. 26. To the District Court's observation that Compagnie could have pursued Woodman's managers in Moroccan insolvency proceedings both before and after the sale, Compagnie replies only that it does not bear the burden of proving the unavailability of every possible legal remedy.

This may be true, but Compagnie must show fraud and injustice, not merely missed opportunities. Because nothing in its brief explains how the sale rendered Starman or Woodman's managers judgment-proof, this argument, too, must fail.

### C. Starman's Alleged Fund Siphoning

Finally, Compagnie argues that the corporate veil should be pierced because even after Woodman became insolvent, it continued to pay its debts to Starwood Hotels, a close affiliate of Starwood Capital, so that another of Starman's subsidiaries, Lehwood Holdings, would not incur contractual liabilities to Starwood Hotels. It claims, in other words, that Starman made Woodman prioritize payments to Starwood Hotels over payments to Compagnie, constituting the type of "fund siphoning" that may warrant veil piercing. *See Manichaean Cap.*, 251 A.3d at 706 (considering "whether the dominant shareholder siphoned company funds" in determining whether to pierce the corporate veil).

Siphoning is "the improper taking of funds that the owner was not legally entitled to receive." *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 557 (D. Del. 2012) (quotation

10

marks and citation omitted).  The record shows that Starman had stopped floating Woodman by early 2013, yet Woodman made at least one payment to Starwood Hotels long after its parental funding had dried up, sparing a Starman subsidiary from contractual penalties.  Crucially, there is evidence that Woodman made these payments in spite of an interim order from the arbitrators forbidding Woodman from making payments to any third parties pending their final decision.  These facts warrant further inquiry into whether Starman in fact directed these payments, and if so, for what purpose.  If they do not definitively establish that Woodman was a sham, they at least create a genuine dispute that it was one, especially given the District Court's findings of genuine disputes over whether Woodman was insolvent, undercapitalized, and a mere façade for Starman.[5]

The District Court rejected Compagnie's siphoning argument, observing that Starwood Hotels was able to withdraw funds directly from Woodman's bank account and that, for several years, Starman did not take money out of Woodman, but instead funded it.  Thus, the Court determined, there could be no genuine dispute that Woodman was merely making a choice to pay "a smaller bill to keep the hotel running rather than a larger bill to make rent," and no reasonable jury could conclude there was siphoning afoot.  *Compagnie des Grands Hôtels d'Afrique*, No. 1:19-cv-00654, 2023 WL 5095274, at *7 (D. Del. Aug. 8, 2023).  We disagree.  That Starman funded Woodman for a time is

---

[5] In describing an entity subject to veil piercing as a "sham," Delaware courst have not required it to be a sham from the outset.  *See Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) ("Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.").

11

not enough, on its own, to warrant summary judgment in Starman's favor. What matters is "not what [Starman] put in the company, but when they took it out," *id.*, and here, Woodman made at least one payment after it was insolvent.

To be clear, we are not holding that Starman in fact siphoned funds, nor are we definitively concluding that, if there was siphoning, it gave rise to the kind of injustice that warrants veil-piercing, either alone or as part of a larger pattern of conduct. Compagnie continues to face the arduous task of persuading the District Court that it has presented "the exceptional case" that requires setting aside the corporate form. *Vichi*, 62 A.3d at 49. With this decision, we are merely holding that the facts, viewed in the light most favorable to Compagnie, raise a genuine issue of material fact upon which a jury could conceivably find in Compagnie's favor. *See Boyle v. Cnty of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).

## CONCLUSION

For the foregoing reasons, we will reverse the District Court's dismissal of Compagnie's agency claims and its grant of summary judgment for Starman on Compagnie's alter ego claim.

MATEY, *Circuit Judge*, dissenting in part.

While I agree that Compagnie's agency claim warrants a second look, I would affirm the District Court's decision on the veil-piercing claim.

Delaware law disregards the corporate form only in "exceptional case[s]." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021) (alteration in original) (quoting *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012)). Under that stringent standard, Compagnie must show, not as a "factor," Maj. Op. at 8 n.4, but as the second step in a two-step test, that Woodman is "a sham and exist[s] for no other purpose than as a vehicle for fraud," *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999). That is quite a high bar. *See, e.g.*, *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, No. 2022-0378, 2023 WL 5688392, at *6 (Del. Ch. Sept. 5, 2023) (noting the fraud or injustice must "come from an inequitable use of the corporate form itself as a sham") (citation omitted); *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("[T]he plaintiff must plead facts supporting an inference that the corporation . . . has created a sham entity designed to defraud investors and creditors.").

Compagnie's claims fall short because there is no suggestion that Woodman existed "solely as a vehicle for fraud." *Wenske v. Blue Bell Creameries, Inc.*, No. 2017-0699, 2018 WL 3337531, at *15 (Del. Ch. July 6, 2018). To be sure, siphoning is one of the factors Delaware courts consider, in the first step of the inquiry, to determine whether the companies are a single economic entity. *Manichaean Cap.*, 251 A.3d at 706–07. But a decision to pierce the corporate veil is "based on some combination of these factors, *in*

*addition to* an overall element of injustice or unfairness." *Id.* at 707 (emphasis added) (quotations and citation omitted). Establishing even that all five of the single economic entity factors are present will not do, as Delaware law requires that these factors stand *alongside* fraud or injustice. That neither erects a "firewall" between the facts, Maj. Op. at 8 n.4, nor creates a freeway where courts can collapse the analysis into one inquiry. Instead, the standard remains—evidence showing a subsidiary existed "*for no other purpose*" than for fraud. *Wallace*, 752 A.2d at 1184 (emphasis added).

As I conclude the District Court properly resolved that question, I respectfully dissent in part.